**ORAL ARGUMENT NOT YET SCHEDULED**

Nos. 13-5368, 13-5371, 14-5021

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PRIESTS FOR LIFE, ET AL.,

*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,

*Defendants-Appellees*.

ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, ET AL.,

*Plaintiffs-Appellants, Cross-Appellees*

v.

KATHLEEN SEBELIUS, in her official capacity as Secretary of the U.S. Department
of Health and Human Services, ET AL.,

*Defendants-Appellees, Cross-Appellants*.

---

On Appeal from the U.S. District Court for the District of Columbia, No. 13-1261
(Hon. Emmet G. Sullivan) & No. 13-1441 (Hon. Amy Berman Jackson)

---

**JOINT PRINCIPAL BRIEF OF APPELLANTS/CROSS-APPELLEES**

---

ROBERT J. MUISE, ESQ.
AMERICAN FREEDOM LAW CENTER
P.O. Box 131098
Ann Arbor, Michigan 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org

DAVID YERUSHALMI, ESQ.
AMERICAN FREEDOM LAW CENTER
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Attorneys for Plaintiffs in Priests for Life*

NOEL J. FRANCISCO
ERIC DREIBAND
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

*Attorneys for Plaintiffs in Roman
Catholic Archbishop of Washington*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Appellants/Cross-Appellees' counsel certify as follows:

**A.     Parties**

No. 13-5368

Plaintiffs-Appellants are Priests for Life, Father Frank Pavone, Alveda King, and Janet Morana.

Defendants-Appellees are Kathleen Sebelius, Secretary, United States Department of Health and Human Services; Thomas E. Perez, Acting Secretary of the United States Department of Labor; Jacob J. Lew, Secretary of the United States Department of the Treasury; the United States Department of Health and Human Services; the United States Department of Labor; and the United States Department of the Treasury.

No. 13-5371 & No. 14-5021

Appellants/Cross-Appellees are the Roman Catholic Archbishop of Washington (the "Archdiocese"), the Consortium of Catholic Academies of the Archdiocese of Washington, Inc. ("CCA"), Archbishop Carroll High School, Inc. ("ACHS), Don Bosco Cristo Rey High School of the Archdiocese of Washington, Inc. ("Don Bosco"), Mary of Nazareth Roman Catholic Elementary School, Inc. ("Mary of Nazareth"), Catholic Charities of the Archdiocese of Washington, Inc. ("Catholic Charities"), Victory Housing, Inc. ("Victory Housing"), the Catholic

Information Center, Inc. ("CIC"), and the Catholic University of America ("CUA").  Thomas Aquinas College was also a plaintiff in the district court, and is a Cross-Appellee here.

Appellees/Cross-Appellants are Kathleen Sebelius, Secretary, United States Department of Health and Human Services; Thomas E. Perez, Acting Secretary of the United States Department of Labor; Jacob J. Lew, Secretary of the United States Department of the Treasury; the United States Department of Health and Human Services; the United States Department of Labor; and the United States Department of the Treasury.

The American Civil Liberties Union supported Appellees/Cross-Appellants before the district court as an amicus curiae.

## B.    Rulings Under Review

Appellants in No. 13-5368  are appealing from the order and supporting memorandum opinion of U.S. District Court Judge Emmet G. Sullivan entered on December 19, 2013, granting Appellees' motion to dismiss and denying Appellants' cross-motion for summary judgment. The order and supporting memorandum opinion appear on the district court's docket at entries 35 and 36, respectively.

Appellants in No. 13-5371 seek review of the December 20, 2013, judgment and memorandum opinion, granting in part and denying in part Defendants' motion to dismiss, or in the alternative, for summary judgment, issued by the Honorable Amy Berman Jackson, United States District Court for the District of Columbia, in Case No. 13-1441, District Court Docket Nos. 47, 48.

**C.     Related Cases**

Appellants are aware of the following related cases involving non-profit plaintiffs currently pending in the United States Courts of Appeals:

- *Univ. of Notre Dame v. Sebelius*, No. 13–3853. (7th Cir.);

- *Roman Catholic Archdiocese v. Sebelius*, No. 14-427 (2d Cir.);

- *Geneva Coll. v. U.S. Dep't of Health & Human Servs.*, No. 14-1374 (3d Cir.);

- *Sebelius v. East Tex. Baptist Univ.*, No. 14-20112 (5th Cir.);

- *Roman Catholic Diocese of Fort Worth v. Sebelius*, (5th Cir.) (docket pending)

- *Mich. Catholic Conference v. Sebelius*, No. 13-2723, *Catholic Diocese v. Sebelius*, No. 13-6640 (6th Cir.) (consol.);

- *Little Sisters of the Poor v. Sebelius*, No. 13-1540 (10th Cir.);

- *S. Nazarene Univ. v. Sebelius*, No. 14-6026 (10th Cir.);

- *Reaching Souls Int'l v. Sebelius*, No. 14-6028 (10th Cir.).

Appellants are aware of the following related cases involving for-profit plaintiffs currently pending in the United States Courts of Appeals or the United States Supreme Court:

- *Sebelius v. Hobby Lobby Stores*, No. 13-354 (certiorari granted)

- *Conestoga Wood Specialties Corp. v. Sebelius*, No. 13-356 (certiorari granted)

- *Autocam Corp. v. Sebelius*, No. 13-482 (petition for certiorari pending)

- *Gilardi v. HHS, et al.*, No. 13-567  (petition for certiorari pending)

- *Korte v. Sebelius*, No. 13-937 (petition for certiorari pending)

- *Annex Medical, Inc., v. Sebelius*, No. 13-1118 (8th Cir.) (injunction pending appeal granted)

- *O'Brien v. U.S. Dept. of HHS*, No. 12-3357 (8th Cir.) (injunction pending appeal granted)


February 28, 2014                    Respectfully submitted,

_/s/ Robert J. Muise_

ROBERT J. MUISE
AMERICAN FREEDOM LAW CENTER
P.O. Box 131098
Ann Arbor, Michigan 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org

DAVID YERUSHALMI
AMERICAN FREEDOM LAW CENTER
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

_Attorneys for Plaintiffs in Priests for Life_

_/s/ Noel J. Francisco_

NOEL J. FRANCISCO
ERIC DREIBAND
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

_Attorneys for Plaintiffs in Roman Catholic Archbishop of Washington_

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

GLOSSARY .............................................................................................. viii

INTRODUCTION ......................................................................................1

JURISDICTIONAL STATEMENT ..........................................................3

STATEMENT OF ISSUES .......................................................................4

STATEMENT OF PERTINENT AUTHORITIES ...................................4

STATEMENT OF THE CASE ..................................................................5

STATEMENT OF FACTS .........................................................................6

    A.    The Mandate ...............................................................................6

        1.    Exemptions from the Mandate ..................................7

        2.    The "Accommodation" ...............................................9

    B.    The Parties ...............................................................................11

        1.    *PFL* Plaintiffs ...........................................................11

        2.    *RCAW* Plaintiffs .......................................................13

SUMMARY OF ARGUMENT ................................................................16

STANDARD OF REVIEW ......................................................................20

ARGUMENT ............................................................................................21

I.    THE MANDATE VIOLATES RFRA .........................................21

    A.    The Mandate Substantially Burdens Plaintiffs' Exercise of Religion ....................................................................................22

        1.    Plaintiffs Exercise Their Religious Beliefs by Refusing to Comply with the Mandate ...................24

        2.    The Mandate Places "Substantial Pressure" on Plaintiffs to Violate Their Religious Beliefs ...........28

    B.    The District Courts' Decisions Were Erroneous ................31

        1.    The *RCAW* District Court Erred in Dismissing Church-Plan Plaintiffs for Lack of Standing .........32

        2.    The Mandate Substantially Burdens Plaintiffs' Religious Exercise ....................................................35

- i -

# TABLE OF CONTENTS

**Page**

3.    The Seventh Circuit's *Notre Dame* Decision Is
Fundamentally Flawed.............................................................46

II.    THE MANDATE VIOLATES THE FREE EXERCISE CLAUSE ............48

III.    THE MANDATE VIOLATES PLAINTIFFS' FIRST AMENDMENT
RIGHTS OF EXPRESSIVE ASSOCIATION .............................................51

IV.    THE MANDATE VIOLATES THE FIRST AMENDMENT
PROTECTION AGAINST COMPELLED SPEECH..................................53

V.    THE MANDATE VIOLATES THE ESTABLISHMENT CLAUSE .........57

VI.    THE MANDATE UNCONSTITUTIONALLY INTERFERES WITH
PLAINTIFFS' INTERNAL CHURCH GOVERNANCE ..........................62

VII.    THE GOVERNMENT HAS ERRONEOUSLY INTERPRETED THE
SCOPE OF THE "RELIGIOUS EMPLOYER" EXEMPTION .................65

VIII.    THE MANDATE VIOLATES THE EQUAL PROTECTION
GUARANTEE OF THE FIFTH AMENDMENT.......................................67

CONCLUSION ....................................................................................................69

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES[*]

**Page(s)**

CASES

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
    133 S. Ct. 2321 (2013) ................................................................53, 55

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
    131 S. Ct. 2806 (2011) ...........................................................................55

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,*
    397 U.S. 150 (1970)................................................................................34

*Ave Maria Found. v. Sebelius,*
    No. 2:13-cv-15198 (E.D. Mich. Dec. 31, 2013).......................................3

*Bowen v. Roy,*
    476 U.S. 693 (1986)...............................................................38, 39, 42

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ...................................................................................53

*Carey v. Brown,*
    447 U.S. 455 (1980)................................................................................67

*Catholic Diocese of Beaumont v. Sebelius,*
    No. 1:13-cv-709, 2014 WL 31652 (E.D. Tex. Jan. 2, 2014)...................2, 34, 38

*Catholic Diocese of Nashville v. Sebelius,*
    No. 3:13-1303, 2013 WL 6834375 (M.D. Tenn. Dec. 26, 2013),
    *injunction pending appeal granted*, No. 13-6640 (6th Cir. Dec. 31, 2013)........3

*Christensen v. Harris Cnty.,*
    529 U.S. 576 (2000)................................................................................66

*Christopher v. SmithKline Beecham Corp.,*
    132 S. Ct. 2156 (2012)............................................................................66

---

[*] Authorities on which we chiefly rely are marked with asterisks.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)...................................................................48, 49

*Colo. Christian Univ. v. Weaver*,
    534 F.3d 1245 (10th Cir. 2008) ..............................................57, 59, 60

*Colvin v. Caruso*,
    605 F.3d 282 (6th Cir. 2010) ...........................................................19

*Diocese of Fort Wayne-S. Bend v. Sebelius*,
    No. 1:12-cv-159, 2013 WL 6843012 (N.D. Ind. Dec. 27, 2013) .......................2

*E. Tex. Baptist Univ. v. Sebelius*,
    No. H-12-3009, 2013 WL 6838893 (S.D. Tex. Dec. 27, 2013)
    ............................................................... 2, 10, 11, 26, 34, 38, 40

*Emory v. United Air Lines, Inc.*,
    720 F.3d 915 (D.C. Cir. 2013).........................................................20

*\*Employment Div. v. Smith*,
    494 U.S. 872 (1990)..........................................................24, 26, 42, 48

*Epperson v. Arkansas*,
    393 U.S. 97 (1968)......................................................................57

*Evergreen Ass'n v. City of New York*,
    740 F.3d 233 (2d Cir. 2014) ...........................................................56

*Found. of Human Understanding v. United States*,
    88 Fed. Cl. 203 (2009)..................................................................61

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
    170 F.3d 359 (3d Cir. 1999) ........................................................49, 55

*Geneva Coll. v. Sebelius*,
    No. 2:12-CV-00207, 2013 WL 3071481 (W.D. Pa. June 18, 2013)................44

*Geneva Coll. v. Sebelius*,
    No. 2:12-cv-00207, 2013 WL 6835094 (W.D. Pa. Dec. 23, 2013)....................2

*Geneva Coll. v. Sebelius*,
    929 F. Supp. 2d 402 (W.D. Pa. 2013)..................................................49

*Gilardi v. U.S. Dep't of Health & Human Servs.,
   733 F.3d 1208 (D.C. Cir. 2013)............................1, 16-19, 21-25, 28, 30, 44, 45

Gonzales v. O Centro Espírita Beneficente União do Vegetal,
   546 U.S. 418 (2006)....................................................................21, 22

Grace Schs. v. Sebelius,
   No. 3:12-cv-459, 2013 WL 6842772 (N.D. Ind. Dec. 27, 2013) .............2, 10, 26

Healy v. James,
   408 U.S. 169 (1972)...........................................................................51

Henderson v. Kennedy,
   253 F.3d 12 (D.C. Cir. 2001)...............................................................41

Hernandez v. Commissioner,
   490 U.S. 680 (1989)...........................................................................36

*Hobby Lobby Stores, Inc. v. Sebelius,
   723 F.3d 1114 (10th Cir. 2013) (en banc) ......................... 17, 22, 30, 43, 44, 47

Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,
   132 S. Ct. 694 (2012)...................................................................62, 63

Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,
   515 U.S. 557 (1995)...........................................................................53

Jolly v. Coughlin,
   76 F.3d 468 (2d Cir. 1996) ...................................................................22

Kaemmerling v. Lappin,
   553 F.3d 669 (D.C. Cir. 2008)...........................................................39, 40

*Korte v. Sebelius,
   735 F.3d 654 (7th Cir. 2013) .............................. 17, 22-24, 28, 30, 31, 36, 37, 41

Larson v. Valente,
   456 U.S. 228 (1982)........................................................................ 57-59

Lawrence v. Texas,
   539 U.S. 558 (2003)...........................................................................69

*Legatus v. Sebelius*,
  No. 12-12061, 2013 WL 6768607 (E.D. Mich. Dec. 20, 2013)....................2, 44

*Little Sisters of the Poor v. Sebelius*,
  No. 13-cv-2611, 2013 WL 6839900 (D. Colo. Dec. 27, 2013), *temporary injunction granted*, No. 13A691, 2013 WL 6869391 (U.S. Dec. 31, 2013) ..3, 34

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)................................................................................34

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988)................................................................................31

*Mich. Catholic Conf. v. Sebelius*,
  No. 1:13-cv-1247, 2013 WL 6838707 (W.D. Mich. Dec. 27, 2013),
  *injunction pending appeal granted*, No. 13-2723 (6th Cir. Dec. 31, 2013) ...3, 34

*Mitchell v. Helms*,
  530 U.S. 793 (2000)................................................................................60

*NAACP v. Alabama*,
  357 U.S. 449 (1958)................................................................................51

*Nat'l Ass'n of Mfrs. v. NLRB*,
  717 F.3d 947 (D.C. Cir. 2013)................................................................53

*New York v. Cathedral Acad.*,
  434 U.S. 125 (1977)................................................................................62

*NLRB v. Catholic Bishop of Chicago*,
  440 U.S. 490 (1979)................................................................................60

*Pac. Gas & Electric Co. v. Pub. Util. Comm'n of Cal.*,
  475 U.S. 1 (1986)...................................................................................56

*Plyler v. Doe*,
  457 U.S. 202 (1982)................................................................................67

*Police Dep't of the City of Chicago v. Mosley*,
  408 U.S. 92 (1972).................................................................................67

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,
    No. 13-1261, 2013 WL 6672400 (D.D.C. Dec. 19, 2013), *injunction*
    *pending appeal granted*, No. 13-5371 (D.C. Cir. Dec. 31, 2013)..................3, 26

*Primas v. District of Columbia*,
    719 F.3d 693 (D.C. Cir. 2013).........................................................................20

*Reaching Souls Int'l, Inc. v Sebelius*,
    No. 13-1092, 2013 WL 6804259 (W.D. Okla. Dec. 20, 2013)...............2, 34, 38

*Riley v. Nat'l Fed'n of Blind*,
    487 U.S. 781 (1988)...........................................................................................56

*R.J. Reynolds Tobacco Co. v. FDA*,
    696 F.3d 1205 (D.C. Cir. 2012) .......................................................................53

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)...........................................................................................51

*Roman Catholic Archdiocese of N.Y. v. Sebelius*,
    No. 12-2542, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013) .......2, 34, 35, 40, 42

*Roman Catholic Diocese of Fort Worth v. Sebelius*,
    No. 4:12-cv-314 (N.D. Tex. Dec. 31, 2013)........................................................2

*Romer v. Evans*,
    517 U.S. 620 (1996)...........................................................................................69

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006).......................................................................................52, 53

*S. Nazarene Univ. v. Sebelius*,
    No. 13-1015, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013) ..................2, 11, 4

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*,
    No. 2:12 cv-92, 2013 WL 6858588 (E.D. Mo. Dec. 30, 2013).....................2, 50

*Sherbert v. Verner*,
    374 U.S. 398, 404 (1963)..............................................................................18, 42

*Tel. & Data Sys., Inc. v. FCC*,
    19 F.3d 42 (D.C. Cir. 1994)...............................................................................33

*Tepeyac v. Montgomery Cnty.*,
   779 F. Supp. 2d 456 (D. Md. 2011), *aff'd* 722 F.3d 184 (4th Cir. 2013)
   (en banc) ..................................................................................... 56

*Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*,
   450 U.S. 707 (1981) ........................................... 17, 22, 23, 36, 42, 43

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) ...................................................................... 66

*United States v. Lee*,
   455 U.S. 252 (1982) ...................................................................... 19

*Univ. of Great Falls v. NLRB*,
   278 F.3d 1335 (D.C. Cir. 2002) ............................................... 58-61

*Univ. of Notre Dame v. Sebelius*,
   No. 13-3853, 2014 WL 687134 (7th Cir. Feb. 21, 2013) ......................... 3, 39, 46

*Ward v. Polite*,
   667 F.3d 727 (6th Cir. 2012) ........................................................ 49

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ............................................................ 18, 23, 42

*Zubik v. Sebelius*,
   No. 2:13-cv-01459, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013) .............. 2, 43

## STATUTES AND REGULATIONS

18 U.S.C. § 2 ...................................................................................... 47

26 U.S.C. § 4980D ...................................................................... 5, 7, 29

26 U.S.C. § 4980H .............................................................. 5, 7, 29, 44

28 U.S.C. § 1291 .................................................................................. 3

28 U.S.C. § 1331 .................................................................................. 3

42 U.S.C. § 300gg-13 ...................................................................... 5, 6

42 U.S.C. § 2000bb-1 ...................................................... 1, 5, 16, 21

42 U.S.C. § 2000bb-2 ................................................................5, 16, 24, 30

42 U.S.C. §2000cc-5 ..................................................................5, 16, 30

42 U.S.C. § 18011 ....................................................................................7

42 U.S.C. § 18031 ....................................................................................4

42 U.S.C. § 18041 ....................................................................................4

**REGULATIONS AND OTHER AUTHORITIES**

26 C.F.R. § 54.9815-1251T ......................................................................7

26 C.F.R. § 54.9815-2713 ........................................................................5

26 C.F.R. § 54.9815–2713A .............................................9, 10, 23, 25, 32, 57

29 C.F.R. § 2510.3-16.........................................................10, 25, 38

29 C.F.R. § 2590.715-2713...............................................................5,

29 C.F.R. § 2590.715-2713A .......................................................5, 9, 26, 32

45 C.F.R. § 147.130 .................................................................................5

45 C.F.R. § 147.131 ...................................................................5, 8, 9, 26, 65

45 C.F.R. § 156.50 ................................................................................33

75 Fed. Reg. 34,538 (June 17, 2010) ....................................................8

75 Fed. Reg. 41, 726 (July 19, 2010).....................................................7

75 Fed. Reg. 7767 (Feb. 11, 2011) ........................................................8

76 Fed. Reg. 46,621 (Aug. 3, 2011)........................................................8

77 Fed. Reg. 8725 (Feb. 15, 2012) ............................................8, 61, 68

77 Fed. Reg. 16,501 (Mar. 21, 2012).............................................65, 66

78 Fed. Reg. 8456 (Feb. 6, 2013) ..............................................8, 58, 59

78 Fed. Reg. 39,870 (July 2, 2013).............................8, 10, 25, 38, 56, 65

Catechism of the Catholic Church ........................................................................18

HRSA, *Women's Preventive Services: Required Health Plan Coverage Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Jan. 16, 2014) ...............................................................................................................6

# GLOSSARY

| | |
|---|---|
| **ACA** | Affordable Care Act |
| **Archbishop Carroll** | Appellant/Cross-Appellee Archbishop Carroll High School, Inc. |
| **Archdiocese** | Appellant/Cross-Appellee Roman Catholic Archbishop of Washington |
| **Catholic Charities** | Appellant/Cross-Appellee Catholic Charities of the Archdiocese of Washington, Inc. |
| **CCA** | Appellant/Cross-Appellee Consortium of Catholic Academies of the Archdiocese of Washington, Inc. |
| **CIC** | Appellant/Cross-Appellee Catholic Information Center, Inc. |
| **CUA** | Appellant/Cross-Appellee the Catholic University of America |
| **Don Bosco** | Appellant/Cross-Appellee Don Bosco Cristo Rey High School of the Archdiocese of Washington, Inc. |
| **Mandate** | The regulatory scheme challenged in this litigation |
| **Mary of Nazareth** | Appellant/Cross-Appellee Mary of Nazareth Roman Catholic Elementary School, Inc. |
| **PFL** | Priests for Life; references to Case No. 13-5368 |
| **Plaintiffs** | All parties challenging the Mandate in these consolidated appeals, including Cross-Appellee Thomas Aquinas College |
| **RCAW** | Roman Catholic Archbishop of Washington; references to  Case Nos. 13-5371 and 14-5021 |
| **RFRA** | Religious Freedom Restoration Act |

| | |
|---|---|
| **TAC** | Cross-Appellee Thomas Aquinas College |
| **TPA** | Third party administrator |
| **Victory Housing** | Appellant/Cross-Appellee Victory Housing, Inc. |

## INTRODUCTION

The Government has promulgated a mandate that forces Plaintiffs[1] to violate their religious beliefs by participating in a regulatory scheme to provide their employees and students with coverage for abortion-inducing products, contraception, sterilization, and related education and counseling (the "Mandate"). Under the Mandate, Plaintiffs must, among other things, contract with a third party that will provide their employees and students with coverage for these products and services; sign and submit a form authorizing that third party to provide or procure the mandated coverage; and take numerous additional steps to keep open the pipeline by which the products and services will flow to Plaintiffs' employees and students.  The Government concedes that Plaintiffs sincerely believe they cannot take these actions without violating their religious beliefs.  (Tr. of *RCAW* Hr'g at 37 (JA444)).  The resolution of these cases, therefore, turns on the answer to a straightforward question: absent interests of the highest order, may the Government force Plaintiffs to take actions that violate their religious beliefs?

Under the Religious Freedom Restoration Act ("RFRA"), the answer to that question is "no."  *See* 42 U.S.C. § 2000bb-1.  As this Court held in *Gilardi v. U.S. Department of Health & Human Services*, 733 F.3d 1208 (D.C. Cir. 2013), the

---

[1] This brief refers to all plaintiffs in these consolidated appeals as "Plaintiffs." Specific references to the No. 13-5368 case will be prefaced by "*PFL*," while similar references to Nos. 13-5371 and 14-5021 will be prefaced by "*RCAW*."

Mandate imposes a substantial burden on religious exercise by placing "'substantial pressure on [plaintiffs] to modify [their] behavior and to violate [their] beliefs.'" *Id.* at 1216 (quoting *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008)). Here, as in *Gilardi,* the Mandate forces Plaintiffs to choose between "violating their religious beliefs" or "paying onerous penalties." *Id.* at 1217. This is, therefore, a textbook case of a "substantial burden" that may be imposed only in accordance with strict scrutiny. Because the Government concedes that *Gilardi* forecloses its strict scrutiny argument,[2] the Mandate must be enjoined.

Indeed, that is exactly what courts have done in eighteen of the nineteen cases to consider the Mandate's application to nonprofit entities like Plaintiffs.[3] In

---

[2] (Gov't *RCAW* Br. at 17 (JA391); Gov't *PFL* Br. at 20 (JA123); Tr. of *RCAW* Hr'g at 37 (JA444)).

[3] *Catholic Diocese of Beaumont v. Sebelius*, No. 1:13-cv-709, 2014 WL 31652 (E.D. Tex. Jan. 2, 2014); *Roman Catholic Diocese of Fort Worth v. Sebelius*, No. 4:12-cv-314 (N.D. Tex. Dec. 31, 2013) (Doc. 99); *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.,* No. 2:12 cv-92, 2013 WL 6858588 (E.D. Mo. Dec. 30, 2013); *Diocese of Fort Wayne-S. Bend v. Sebelius*, No. 1:12-cv-159, 2013 WL 6843012 (N.D. Ind. Dec. 27, 2013); *Grace Schs. v. Sebelius*, No. 3:12-cv-459, 2013 WL 6842772 (N.D. Ind. Dec. 27, 2013); *E. Tex. Baptist Univ. v. Sebelius*, No. H-12-3009, 2013 WL 6838893 (S.D. Tex. Dec. 27, 2013); *S. Nazarene Univ. v. Sebelius*, No. 13-1015, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013); *Geneva Coll. v. Sebelius*, No. 2:12-cv-00207, 2013 WL 6835094 (W.D. Pa. Dec. 23, 2013); *Reaching Souls Int'l, Inc. v Sebelius*, No. 13-1092, 2013 WL 6804259 (W.D. Okla. Dec. 20, 2013); *Legatus v. Sebelius*, No. 12-12061, 2013 WL 6768607 (E.D. Mich. Dec. 20, 2013); *Roman Catholic Archdiocese of N.Y. v. Sebelius ("RCNY")*, No. 12-2542, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013); *Zubik v. Sebelius*, No.

---

- 2 -

light of this extraordinary rate of accord among the federal courts, as well as this Court's decision in *Gilardi*, the decisions below should be reversed.

## JURISDICTIONAL STATEMENT

The district courts had jurisdiction pursuant to 28 U.S.C. § 1331. On December 19, 2013, the *PFL* court granted the Government's motion to dismiss and denied as moot the parties' cross-motions for summary judgment. (JA137). That same day, the *PFL* Plaintiffs filed a timely notice of appeal. (JA183). The *RCAW* court entered judgment on December 20, 2013 (JA447), and the *RCAW* Plaintiffs filed their notice of appeal on December 21, (JA551). This Court has jurisdiction under 28 U.S.C. § 1291.

---

2:13-cv-01459, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013); *Ave Maria Found. v. Sebelius*, No. 2:13-cv-15198 (E.D. Mich. Dec. 31, 2013) (Doc. 12); *Little Sisters of the Poor v. Sebelius*, No. 13-cv-2611, 2013 WL 6839900 (D. Colo. Dec. 27, 2013), *injunction pending appeal granted*, No. 13A691 (U.S. Jan. 24, 2014); *Mich. Catholic Conf. v. Sebelius*, No. 1:13-cv-1247, 2013 WL 6838707 (W.D. Mich. Dec. 27, 2013), *injunction pending appeal granted*, No. 13-2723 (6th Cir. Dec. 31, 2013); *Catholic Diocese of Nashville v. Sebelius*, No. 3:13-1303, 2013 WL 6834375 (M.D. Tenn. Dec. 26, 2013), *injunction pending appeal granted*, No. 13-6640 (6th Cir. Dec. 31, 2013); (JA553). *But see Univ. of Notre Dame v. Sebelius*, No. 13-3853, 2014 WL 687134 (7th Cir. Feb. 21, 2013).

## STATEMENT OF ISSUES

1.      Whether the Mandate imposes a substantial burden on Plaintiffs' exercise of religion in violation of RFRA.

2.      Whether the Mandate, which is not neutral or generally applicable, burdens Plaintiffs' religious exercise in violation of the Free Exercise Clause.

3.      Whether the Mandate violates Priests for Life's First Amendment right to expressive association.

4.      Whether the Mandate violates the First Amendment protection against compelled speech.

5.      Whether the Mandate violates the Establishment Clause by discriminating among religious groups and excessively entangling the Government with religious groups' beliefs and practices.

6.      Whether the Mandate unconstitutionally interferes with Plaintiffs' internal church governance.

7.      Whether the Government has erroneously interpreted the scope of the "religious employer" exemption.

8.      Whether the Mandate violates the Fifth Amendment's guarantee of equal protection.

## STATEMENT OF PERTINENT AUTHORITIES

The following provisions are reproduced in the addendum hereto:  26 U.S.C.

§§ 4980D, 4980H; 42 U.S.C. §§ 300gg-13, 2000bb-1, 2000bb-2, 2000cc-5; 26 C.F.R. §§ 54.9815-2713, 54.9815-2713A; 29 C.F.R. §§ 2590.715-2713, 2590.715-2713A; 45 C.F.R. §§ 147.130, 147.131.

## STATEMENT OF THE CASE

These consolidated appeals arise from Plaintiffs' challenges to the Affordable Care Act's contraceptive coverage Mandate. On August 19, 2013, Priests for Life, Father Frank Pavone, Alveda King, and Janet Morana challenged the Mandate under RFRA and the First and Fifth Amendments to the U.S. Constitution. Facing an enforcement date of January 1, 2014, *PFL* Plaintiffs moved for a preliminary injunction on September 19, 2013 (*PFL* R-7), which the court consolidated with a ruling on the merits. (Minute Order of 9/25/13). On December 19, 2013, the court granted the Government's motion to dismiss and denied the parties' cross-motions for summary judgment as moot. (JA137). *PFL* Plaintiffs noticed their appeal that same day, and sought an injunction pending appeal.

The *RCAW* Plaintiffs filed suit on September 20, 2013, alleging violations of RFRA, the First Amendment, and the Administrative Procedure Act. After Plaintiffs moved for a preliminary injunction on September 24, 2013 (*RCAW* R-6), the district court consolidated briefing with the parties' cross-motions for summary judgment. On December 20, the court: (1) denied relief to nine of ten Plaintiffs on

their RFRA claims; (2) granted summary judgment in favor of Plaintiff Thomas Aquinas College's RFRA claim; (3) granted summary judgment on Plaintiffs' claim that the Mandate's "gag rule" violated the First Amendment; and (4) denied relief on Plaintiffs' remaining claims. (JA447, JA449). Plaintiffs noticed their appeal on December 21 (JA551), and filed a motion for an injunction pending appeal with the district court, which was denied on December 23 (JA545). Their appeal was docketed on December 23, and Plaintiffs simultaneously moved for an injunction pending appeal.

This Court granted Plaintiffs' motions for injunctions pending appeal and consolidated these cases on December 31, 2013. (JA553). Subsequently, the Court consolidated the Government's appeal in the *RCAW* case, which was noticed on January 17, 2014.

## STATEMENT OF FACTS

### A.     The Mandate

The   Affordable Care Act requires "group health plan[s]" to include coverage for women's "preventive care and screenings." 42 U.S.C. § 300gg-13(a)(4). The Government has defined "preventive care and screenings" to include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." HRSA, *Women's Preventive Services: Required Health Plan Coverage*

*Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 27, 2014). FDA-approved contraceptive methods and sterilization procedures include intrauterine devices (IUDs), the morning-after pill (Plan B), and Ulipristal (Ella), all of which can induce an abortion. (Comments of U.S. Conference of Catholic Bishops, Mar. 20, 2013 (JA329); Fr. Pavone Decl. ¶ 16 (JA45-46)). The Government's stated objective is "to increase access to and utilization of [contraceptive] services, which are not at optimal levels today." 75 Fed. Reg. 41,726, 41,733 (July 19, 2010).

If an employer's health plan does not include the required coverage, the employer is subject to penalties of $100 per day per affected beneficiary. 26 U.S.C. § 4980D(b). Dropping employee health coverage likewise subjects employers to penalties of $2,000 per year per employee after the first thirty employees. *Id.* § 4980H(a), (c)(1). Student health plans must also include the objectionable coverage. *See* 76 Fed. Reg. 7767, 7772 (Feb. 11, 2011).

### 1.    Exemptions from the Mandate

From its inception, the Mandate has exempted numerous health plans covering millions of people. For example, certain plans in existence at the time of the ACA's adoption are "grandfathered" and exempt from the Mandate. 42 U.S.C. § 18011; 26 C.F.R. § 54.9815-1251T(g)(1)(v). By the Government's own estimates, over 90 million individuals participate in health plans excluded from the

scope of the Mandate.  75 Fed. Reg. 34,538, 34,552-53 (June 17, 2010).

Acknowledging the burden the Mandate places on religious exercise, the Government also created an exemption for plans sponsored by "religious employers."  45 C.F.R. § 147.131(a).  That exemption, however, is narrowly defined to protect only "the unique relationship between a house of worship and its employees in ministerial positions."  76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011); 77 Fed. Reg. 8725, 8727-28, 8730 (Feb. 15, 2012).  For religious entities that do not qualify as "houses of worship," there is no exemption.

Despite sustained criticism, the Government refused to expand the "religious employer" exemption.  *See* 78 Fed. Reg. 8456, 8461 (Feb. 6, 2013).  Instead, it devised an inaptly named "accommodation" for non-exempt religious organizations, which went into effect "for plan years beginning on or after January 1, 2014."  78 Fed. Reg. 39,870 (July 2, 2013).  The purpose and effect of the accommodation continues to be "expanding access to and utilization of" contraceptive services by requiring coverage of such services for beneficiaries of a religious organization's healthcare plan so long as they are enrolled in the plan.  *Id.* at 39,887; 77 Fed. Reg. at 8728 (declining to consider a "broader exemption" due to the unsupported belief that "[i]ncluding these employers within the scope of the exemption would subject their employees to the religious views of the employer, limiting access to contraceptives, and thereby inhibiting the use of contraceptive

services").

### 2.     The "Accommodation"

To be eligible for the "accommodation," an entity must (1) "oppose[]" providing coverage for some or all of [the] contraceptive services"; (2) be "organized and operate[] as a nonprofit entity"; (3) "hold[] itself out as a religious organization"; and (4) self-certify that it meets the first three criteria.  26 C.F.R. § 54.9815-2713A(a).  If an organization meets these criteria and wishes to avail itself of the "accommodation," it must provide the required "self-certification" to its insurance company or, if the organization has a self-insured health plan, to its third party administrator ("TPA").  *Id.*

When an "eligible organization" submits the self-certification form, it confers upon its insurance company or TPA both the authority and obligation to provide or arrange "payments for contraceptive services" for beneficiaries enrolled in the organization's health plan pursuant to the accommodation.  *See* 26 C.F.R. § 54.9815-2713A(a)-(c).   Absent the self-certification, neither an insurance company nor a TPA may provide such payments under the accommodation.  These payments, moreover, are available only "so long as [beneficiaries] are enrolled in [the organization's] health plan."  29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(c)(2)(i)(B).  The "self-certification [also] notifies the TPA or issuer of their obligations [1] to provide contraceptive-coverage to employees otherwise

covered by the plan and [2] to notify the employees of their ability to obtain these benefits." *E. Tex. Baptist*, 2013 WL 6838893, at *11.

For self-insured organizations, the Mandate has additional implications. The self-certification form, for example, "designat[es] the [TPA] as plan administrator and claims administrator for contraceptive benefits." 78 Fed. Reg. at 39,879. Indeed, the Government concedes that "'in the self-insured [context], the contraceptive coverage is part of the [self-insured organization's health] plan.'" (*RCAW* Ct. at 42 (JA490)); 29 C.F.R. § 2510.3-16 (stating that the certification is "an instrument under which the plan is operated"). Moreover, TPAs are under no obligation "to enter into, or remain in, a contractual relationship with the eligible organization." 78 Fed. Reg. at 39,880. Consequently, religious organizations must find and contract with a TPA willing to provide the coverage. Finally, once the self-insured organization signs and submits the self-certification, it is prohibited from "directly or indirectly, seek[ing] to influence [its TPA's] decision" to provide contraceptive coverage, 26 C.F.R. § 54.9815-2713A(b)(iii), or from terminating its contractual relationship with the TPA because of the TPA's provision of objectionable coverage.

In short, under the accommodation, religious organizations must identify and authorize a third party to provide the very coverage they find objectionable. "The self certification is, in effect, a permission slip which must be signed by the

institution to enable the plan beneficiary to get access, free of charge, from the institution's insurer or [TPA], to the products to which the institution objects." *S. Nazarene*, 2013 WL 6804265, at *8-9. "If the institution does not sign the permission slip, it is subject to very substantial penalties or other serious consequences." *Id.* at *8. "If the institution does sign the permission slip, and only if the institution signs the permission slip, [the] institution's insurer or [TPA] is obligated to provide the free products and services to the plan beneficiary." *Id.*

### B.    The Parties

#### 1.    *PFL* Plaintiffs

Priests for Life is a nonprofit religious organization. It was founded in 1991 to do one of the most important tasks in the Catholic Church today: to help spread the Gospel of Life to people throughout the world. The Gospel of Life, which is an expression of the Catholic Church's position and central teaching regarding the value and inviolability of human life, affirms and promotes the culture of life and actively opposes and rejects the culture of death. Father Frank Pavone is the National Director of Priests for Life; Alveda King is the Pastoral Associate and Director of African-American Outreach; and Janet Morana is the Executive Director.

Priests for Life provides healthcare insurance for its employees through an insurer, United Healthcare. Its plan year begins on January 1. In accordance with

Catholic beliefs, this plan does not provide or facilitate coverage for abortion-inducing products, contraception, sterilization, or related counseling.

Priests for Life, like all Plaintiffs here, is bound by the Catholic doctrine prohibiting impermissible cooperation with evil.  Under this doctrine, its religious beliefs prohibit it from purchasing a healthcare plan that provides its employees with access to contraceptives, sterilization, and abortion-inducing products, all of which are prohibited by its religious convictions.  This is true whether the immoral services are paid for directly, indirectly, or even not at all by Priests for Life, which believes that contraception, sterilization, and abortifacients are immoral regardless of their cost.  Although Priests for Life is a religious organization, it does not qualify for the Mandate's "religious employer" exemption.  (Fr. Pavone Decl. ¶¶ 3, 4, 6-16, 26 (JA43-48)).

Father Pavone summed up Priests for Life's religious objection to the Mandate and its "accommodation" as follows:

> Priests for Life cannot and will not submit to _any_ requirement imposed by the federal government that has the purpose or effect of providing access to or increasing the use of contraceptive services. This specifically includes the requirement under the so-called "accommodation" that Priests for Life provide its healthcare insurer with a "self-certification" that will then trigger the insurer's obligation to make "separate payments for contraceptive services directly for plan participants and beneficiaries" of Priests for Life's health care plan. This "self-certification" is the moral and factual equivalent of an "authorization" by Priests for Life to its insurer to provide coverage for contraceptive services to its plan participants and

beneficiaries.  Priests for Life is prohibited based on its sincerely held religious beliefs from cooperating in this manner with the federal government's immoral objectives.

These sincerely held religious beliefs, which prohibit Priests for Life from executing the "self-certification," are neither trivial nor immaterial, but rather central to the teaching and core moral admonition of our faith, which requires us to avoid mortal sin.  Thus, neither Plaintiffs nor Priests for Life can condone, promote, or cooperate with the government's illicit goal of increasing access to and utilization of contraceptive services—the express goal of the challenged mandate and the government's so-called "accommodation."

(Priests for Life Supp. Decl. ¶¶ 5-6 (JA106)).  In short, the burden that the Mandate imposes on Priests for Life's religious exercise is precisely the same whether the Government is forcing Priests for Life to authorize, enable, endorse, and facilitate "access to and utilization of" contraceptive services for its plan participants and beneficiaries via signing a "self-certification" or via payment to its insurance carrier.

## 2. *RCAW* Plaintiffs

The *RCAW* Plaintiffs provide a range of spiritual, charitable, educational, and social services to members of their communities, Catholic and non-Catholic alike.

- Roman Catholic Archbishop of Washington (the "Archdiocese") provides pastoral care and spiritual guidance for nearly 600,000 Catholics, while serving individuals throughout the D.C. area through schools and charitable programs.

- The Consortium of Catholic Academies of the Archdiocese of Washington,

Inc. ("CCA") consists of four inner-city parish schools serving primarily minority and low-income students.

- Archbishop Carroll High School, Inc.  ("Archbishop Carroll") provides a religiously and ethnically diverse student body with a rigorous college preparatory education.

- Don Bosco Cristo Rey High School of the Archdiocese of Washington, Inc. ("Don Bosco") likewise provides a diverse student body with a rigorous education, offering a unique program that enables students to gain work experience and earn money to pay for a portion of their education.

- Mary of Nazareth Roman Catholic Elementary School, Inc. ("Mary of Nazareth") is a regional Catholic elementary school serving students from various parishes in the Archdiocese.

- Catholic Charities of the Archdiocese of Washington, Inc. ("Catholic Charities") is the largest nongovernmental social service provider in the region.

- Victory Housing, Inc. provides affordable housing and related social services to low- and moderate-income senior citizens and families.

- The Catholic Information Center, Inc. ("CIC") offers a variety of spiritual books and resources, as well as religious, intellectual, and professional programs.

- The Catholic University of America ("CUA") offers nearly 7,000 students a rigorous education, while serving the larger community through research centers, intellectual offerings, and charitable outreach.

- Thomas Aquinas College ("TAC") offers a Catholic liberal-arts education, fostering a community of scholars dedicated to the intellectual tradition and moral teachings of the Catholic Church.

Despite their avowedly religious missions, aside from the Archdiocese, the *RCAW*

Plaintiffs do not qualify as exempt "religious employers." (*RCAW* Ct. at 14

(JA461)).

As entities affiliated with the Catholic Church, Plaintiffs sincerely believe that life begins at the moment of conception, and that certain "preventive" services that interfere with conception or terminate a pregnancy are immoral. Accordingly, they may not provide, pay for, and/or facilitate access to contraception, sterilization, abortion, or related counseling in a manner that violates the teachings of the Catholic Church. [4]

Historically, Plaintiffs have exercised their religious beliefs by offering health coverage in a manner consistent with Catholic teaching. [5] The Archdiocese thus operates a self-insured health plan that includes not only its own employees, but also the employees of CCA, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC. Their plan year began on January 1. (Belford Aff. ¶¶ 11-14 (JA274)). Catholic University offers its employees insured health care plans provided by United Healthcare, and makes insurance available to its students through AETNA. Catholic University's

---

[4] (*See* Affidavit of the Archdiocese ("Belford Aff.") ¶¶ 9-10 (JA273-74); Affidavit of CCA ("Conley Aff.")  ¶¶ 7-14 (JA280-82); Affidavit of ACHS ("Blaufuss Aff.") ¶¶ 7-14 (JA285-87); Affidavit of Don Bosco ("Shafran Aff.") ¶¶ 7-14 (JA290-92); Affidavit of Mary of Nazareth ("Friel Aff.") ¶¶ 7-14 (JA295-97); Affidavit of Catholic Charities ("Enzler Aff.") ¶¶ 7-14 (JA301-03); Affidavit of Victory Housing ("Brown Aff.") ¶¶ 7-14 (JA307-09); Affidavit of CIC ("Panula Aff.") ¶¶ 7-14 (JA313-15); Affidavit of CUA ("Persico Aff.") ¶¶ 13-20 (JA319-20); Affidavit of TAC ("DeLuca Aff.") ¶¶ 11-17 (JA325-26); Affidavit of Rev. Carter Griffin ¶¶ 8-20 (JA384-87)).

[5] (Belford Aff. ¶¶ 15, 22 (JA275-76); Persico Aff. ¶ 15 (JA319); DeLuca Aff. ¶ 13 (JA325)).

employee plan year begins on December 1, and its student plan year begins on August 14. (Persico Aff. ¶¶ 8-11 (JA318)). And TAC offers its employees a health plan through the RETA Trust, a self-insurance trust established by the Catholic bishops of California. Its plan year begins on July 1. (DeLuca Aff. ¶¶ 8-9 (JA324)). In accordance with Catholic beliefs, none of these health plans provide or facilitate coverage for abortion-inducing products, contraception, sterilization, or related counseling. *Supra* note 5.

## SUMMARY OF ARGUMENT

The district court's decisions are contrary to RFRA, the First and Fifth Amendments, and the Administrative Procedure Act.

RFRA prohibits the Government from imposing a "substantial burden" on "any" exercise of religion unless the burden is the least restrictive means of advancing a compelling government interest. 42 U.S.C. §§ 2000bb-1, 2000bb-2(4), 2000cc-5(7). Here, the Government concedes that *Gilardi* forecloses any argument that the Mandate survives strict scrutiny. *Supra* note 2. Under RFRA, therefore, the only question before this Court is whether the Mandate imposes a "substantial burden" on Plaintiffs' exercise of religion. *Gilardi,* however, answers that question too.

Under *Gilardi*, "[a] 'substantial burden' is 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" 733 F.3d at 1216

- 16 -

(quoting *Kaemmerling*, 553 F.3d at 678); *Korte v. Sebelius,* 735 F.3d 654, 683 (7th Cir. 2013) ("[T]he substantial-burden test under RFRA focuses primarily on the '*intensity of the coercion* applied by the government to act contrary to religious beliefs.'"); *Hobby Lobby Stores*, *Inc. v. Sebelius*, 723 F.3d 1114, 1137-41 (10th Cir. 2013) (en banc) (same).  "Put another way, the substantial-burden inquiry evaluates the coercive effect of the governmental pressure on the adherent's religious practice and steers well clear of deciding religious questions."  *Korte*, 735 F.3d at 683.  Thus, so long as the plaintiff has an "'honest conviction' that what the government is requiring, prohibiting, or pressuring him to do, conflicts with his religion," *id.* (quoting *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981)), this Court's "only task is to determine whether" "the government has applied *substantial* pressure on the claimant" to act contrary to his faith, *Hobby Lobby*, 723 F.3d at 1137 (emphasis added).

Here, the Government concedes that, like the plaintiffs in *Gilardi*, Plaintiffs have an "honest conviction" that they cannot take the actions required by the accommodation without violating their religious beliefs.  Indeed, before the *RCAW* court, the Government candidly acknowledged that Plaintiffs believe that compliance with the Mandate "requires facilitation of contraceptive coverage and that that's a violation of [Plaintiffs']  religious beliefs" and stated that it was neither "question[ing] those" beliefs, nor asking the court "to question" them.  (Tr.

of *RCAW* Hr'g at 37 (JA444)).  In particular, the Mandate requires Plaintiffs to take numerous actions that, under their Catholic beliefs, constitute impermissible cooperation in immoral conduct and give rise to "scandal"[6]—including, among other things, contracting with third parties authorized or obligated to provide the mandated coverage, signing and submitting the self-certification, and maintaining health plans that will serve as conduits for the delivery of the mandated coverage.

The only relevant question, therefore, is whether Plaintiffs are being substantially pressured to take these actions.  *Gilardi*, however, has already answered that question, as it held that the same penalty scheme at issue in this case *does* amount to "substantial pressure" under RFRA.  As the *Gilardi* court explained: "If [these penalties are] not 'substantial pressure on an adherent to modify his behavior and to violate his beliefs,' [it is impossible] to see how the standard could be met."  733 F.3d at 1218; *see also Thomas*, 450 U.S. at 717; *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).  It is, therefore, irrelevant that the actions at issue in *Gilardi* were slightly different than in this case, since the only question is whether the Government is coercing Plaintiffs into taking actions that violate their religious beliefs.  In *Gilardi*, as here, the answer to that question is plainly "yes."

---

[6] "Scandal" involves leading, by words or actions, other persons to engage in wrongdoing.  *See* Catechism of the Catholic Church ¶ 2284.

The courts below reached a contrary conclusion only by rejecting Plaintiffs'
understanding of their own religious beliefs.  In the district courts' view, Plaintiffs
do not really object to the actions the Mandate requires of them, but rather to the
actions the Mandate requires of third parties.   Thus, despite undisputed
declarations to the contrary, the *PFL* court concluded that the *PFL* Plaintiffs have
no religious objection to signing the self-certification.  (*PFL* Ct. at 3-4 (JA140-
41)).  Likewise, the *RCAW* court "determine[d that] compliance" with the Mandate
does not "actually constitute[] compelled 'facilitation,'" (*RCAW* Ct. at
27 (JA475)), or "give rise to 'scandal … in a way inconsistent with Church
teachings,'" (*id.* at 31 n.10 (JA479)).   Needless to say, these forays into "the
theology behind Catholic precepts on contraception" were manifestly improper
(and incorrect).  *Gilardi*, 733 F.3d at 1216.  As the Supreme Court has repeatedly
admonished, "[i]t is not within the judicial function" to determine whether a
plaintiff "has the proper interpretation of [his] faith."  *United States v. Lee*, 455
U.S. 252, 257 (1982) (citation omitted).  It is, therefore, clear that the Mandate
imposes a "substantial burden" on Plaintiffs' religious beliefs in violation of
RFRA.

The Mandate is also unlawful for numerous additional reasons.  It violates
the Free Exercise Clause by targeting Plaintiffs' religious practices, offering a
multitude of exemptions to other employers for non-religious reasons, but denying

any exemption that would relieve Plaintiffs' religious hardship.  It infringes on Plaintiffs' freedom of speech by forcing Plaintiffs to engage in and support speech contrary to their core religious beliefs.  It violates the Establishment Clause by creating a state-favored category of "religious employers" based on intrusive judgments about their religious practices, beliefs, and structure.    It unconstitutionally interferes with Plaintiffs' internal church governance, and it violates the Fifth Amendment's guarantee of equal protection by discriminating on the basis of religion.  Finally, the Government's erroneous interpretation of the scope of the "religious employer" exemption improperly expands the number of organizations subject to the Mandate.

Accordingly, the district courts' denial of relief to Plaintiffs should be reversed.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment *de novo*, "viewing the evidence in the light most favorable to [the non-moving party]." *Primas v. District of Columbia*, 719 F.3d 693, 696 (D.C. Cir. 2013).  It likewise reviews the grant of a motion to dismiss *de novo*, "'accepting the factual allegations made in the complaint as true and giving plaintiffs the benefit of all inferences that can reasonably be drawn from their allegations.'" *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 921 (D.C. Cir. 2013) (citation omitted).

## ARGUMENT

## I.    THE MANDATE VIOLATES RFRA

Under RFRA, the Government may not "substantially burden a person's exercise of religion" unless it "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1; *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 423 (2006).

In *Gilardi*, this Court held that the Mandate substantially burdened the religious exercise of Catholic business owners by requiring their corporations to offer coverage for contraception and related services.  733 F.3d at 1216-18.  The Court began by "explaining what is not at issue," noting that the case was "*not* about the sincerity of the [Gilardis'] religious beliefs, nor does it concern the theology behind Catholic precepts on contraception.  The former is unchallenged, while the latter is unchallengeable."  *Id.* at 1216.  Instead, the Court accepted the Gilardis' description of their religious beliefs and asked whether the Mandate imposed a "substantial burden" by coercing the Gilardis into acting contrary to those beliefs.  *Id.* at 1216-18.  The Court answered that question in the affirmative, because the Mandate forced the Gilardis to choose between "pay[ing] a penalty of over $14 million" or taking actions that they believed would make them "complicit

in a grave moral wrong." *Id.* at 1217-18. Finally, because the Mandate imposed a "substantial burden" on the Gilardis' religious exercise, the Court applied strict scrutiny, which the Mandate could not survive. *Id.* at 1220-22.

Here, the Government concedes *Gilardi* forecloses any argument that the Mandate satisfies strict scrutiny. Consequently, the only question before this Court under RFRA is whether the Mandate substantially burdens Plaintiffs' religious exercise. It plainly does.

### A.     The Mandate Substantially Burdens Plaintiffs' Exercise of Religion

Where, as here, sincerity is not in dispute, RFRA's substantial burden test involves a straightforward inquiry: a court must (1) "identify the religious belief" at issue, and (2) determine "whether the government [has] place[d] substantial pressure" on the plaintiff to violate that belief. *Hobby Lobby*, 723 F.3d at 1140; *Korte*, 735 F.3d at 682-84; *Gilardi*, 733 F.3d at 1216.

Under the first step, the court's inquiry is necessarily "limited"; its "scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996); *Gilardi*, 733 F.3d at 1216-17. After all, it is not "'within the judicial function'" to determine whether a belief or practice is in accord with a particular faith. *Thomas*, 450 U.S. at 716. Courts must therefore accept the plaintiffs' description of their religious exercise regardless of whether the court, or the

Government, finds it "acceptable, logical, consistent, or comprehensible." *Id.* at 714-15. "It is enough that the claimant has an 'honest conviction' that what the government is requiring, prohibiting, or pressuring him to do conflicts with his religion." *Korte*, 735 F.3d at 683 (quoting *Thomas*, 450 U.S. at 716).

Under the second step, the court "evaluates the coercive effect of the governmental pressure on the adherent's religious practice." *Korte*, 735 F.3d at 683. Specifically, it must determine whether the Government is compelling an individual to act contrary to his beliefs, *Yoder*, 406 U.S. at 218, or putting "'substantial pressure on [him] to modify his behavior and to violate his beliefs,'" *Gilardi*, 733 F.3d at 1216-18 (citation omitted).

Here, it is clear that the Mandate substantially burdens Plaintiffs' exercise of religion. *First,* it is undisputed that Plaintiffs exercise their religion by refusing to take certain actions that, in their religious judgment, impermissibly facilitate access to the objectionable coverage in violation of their Catholic beliefs. *Second,* it is equally clear that the Mandate substantially burdens that religious exercise by threatening Plaintiffs with onerous penalties unless they take precisely those actions their religious beliefs forbid. The Mandate is, accordingly, irreconcilable with RFRA.

### 1.     Plaintiffs Exercise Their Religious Beliefs by Refusing to Comply with the Mandate

It is undisputed that the actions the Mandate requires Plaintiffs to take are contrary to their religious beliefs and that Plaintiffs therefore exercise their religion by refusing to engage in such conduct.  As the Government conceded: "[W]e understand the plaintiffs believe that participating in the accommodation requires facilitation of contraceptive coverage and that that's a violation of their religious beliefs.  We don't question that.  We're not asking Your Honor to question that either."  (Tr. of *RCAW* Hr'g at 37 (JA444)).

This concession follows from the plain text of RFRA and Supreme Court precedent.  In particular, the "exercise of religion" includes "the performance of (or abstention from) physical acts."  *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990). Under RFRA, religious exercise is "broadly defined" to include "'*any* exercise of religion . . . whether or not compelled by, or central to, a system of religious belief.'"  *Gilardi*, 733 F.3d at 1216 (quoting 42 U.S.C. § 2000cc-5(7)(A)); *see also* 42 U.S.C. § 2000bb-2(4); *Korte*, 735 F.3d at 674 ("'[E]xercise of religion' should be understood in a generous sense.").  When identifying a religious exercise, a court may evaluate the sincerity of a plaintiff's beliefs (which is not at issue in this case), but it may not assess the theology behind those beliefs.  *Gilardi*, 733 F.3d at 1216.

Here, Plaintiffs' undisputed testimony establishes that they exercise their religion by "operat[ing] their [organizations]" according to their faith and refusing to take numerous actions required of them under the Mandate.  *Id.* at 1217.  As an initial matter, Plaintiffs object to being forced to contract with a third party that is authorized or obligated to provide the objectionable coverage to Plaintiffs' employees and students.  26 C.F.R. § 54.9815-2713A(b)(2); 78 Fed. Reg. at 39,880.  Indeed, until now, Plaintiffs have always done the opposite. *Supra* pp. 11-16.  Plaintiffs likewise believe that submitting the self-certification violates their religious beliefs, because doing so makes them "complicit in a grave moral wrong." *Gilardi*, 733 F.3d at 1218; (Priests for Life Supp. Decl. ¶¶ 5-6 (JA106)); *supra* note 4 (citing affidavits).

These religious objections to the self-certification should hardly be surprising.  The self-certification is far more than a simple statement of religious objection to the provision of contraceptive coverage.  To the contrary, for self-insured Plaintiffs, it "designat[es]" their TPA "as plan administrator and claims administrator for contraceptive benefits," 78 Fed. Reg. at 39,879, and serves as "an instrument under which [their health] plan[s are] operated," 29 C.F.R. § 2510.3-16(b).  And for all Plaintiffs, it affirmatively authorizes their TPA or insurance company to provide Plaintiffs' employees or students with the mandated coverage, simultaneously "notify[ing] the TPA or issuer of their obligations to [(1)] provide

contraceptive-coverage to [Plaintiffs'] employees [and (2) to inform them] of their ability to obtain those benefits." *E. Tex. Baptist*, 2013 WL 6838893, at *11. Like many religious traditions, Plaintiffs' faith forbids them from either themselves engaging in immoral conduct or authorizing or enabling someone else to do so. Under Plaintiffs' Catholic beliefs, that is precisely what the self-certification does.

Nor are these the only religiously objectionable actions the Mandate requires Plaintiffs to undertake. Plaintiffs cannot, consistent with their religious beliefs, offer health plans that serve as a conduit for the delivery of the objectionable products and services. Yet upon issuance of the self-certification, that is exactly what Plaintiffs' health plans become. Plaintiffs' insurance company or TPA will provide the objectionable coverage to Plaintiffs' employees only by virtue of their enrollment in Plaintiffs' health plans and only "so long as [they] are enrolled in [those] plan[s]." 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(c)(2)(i)(B). Indeed, the Government has conceded that once a self-insured organization provides the certification, "'technically, the contraceptive [and other objectionable] coverage is part of the [self-insured organization's health] plan.'" (*RCAW* Ct. at 42 (JA490)). In this regard, the Government's vaunted "accommodation" is materially indistinguishable from the regulation enjoined in *Gilardi*. Both require employers to offer health plans that cover the objectionable products and services.

The only difference is that for Plaintiffs, the coverage is written into their plans in invisible ink.

Finally, once Plaintiffs "turn on the tap" by offering health plans through a third party willing to provide the mandated coverage and authorizing such coverage via the self-certification, they must take numerous additional steps to ensure the pipeline remains open. Thus, among other things, Plaintiffs must:

- Pay premiums or fees to a third party authorized to provide their employees with the mandated coverage.

- Offer enrollment paperwork for employees to enroll in a plan overseen by a third party authorized to provide the objectionable coverage.

- Send (or tell employees where to send) health-plan-enrollment paperwork to a third party authorized to provide the objectionable coverage.

- Identify health plan beneficiaries for a third party authorized to provide the objectionable coverage.

- Refrain from canceling an insurance arrangement with a third party authorized to provide the mandated coverage.

- Refrain from attempting to influence a third party's decision to provide the mandated coverage.

Plaintiffs have an undisputedly sincere religious objection to taking all of these actions, which are necessary to maintain their health plans in compliance with the "accommodation." *Supra* note 4 (citing affidavits).

In sum, Plaintiffs are required to play an integral role in the delivery of objectionable products and services to their plan beneficiaries.[7]  Each of the actions or forbearances detailed above constitutes an exercise of religion, *Smith*, 494 U.S. at 877, because Plaintiffs sincerely believe that taking or refraining from these actions would make them "complicit in a grave moral wrong," *Gilardi*, 733 F.3d at 1218, and would "undermine their ability to give witness to the moral teachings" of the Catholic Church, *Korte*, 735 F.3d at 683.  In other words, Plaintiffs "ha[ve] an 'honest conviction' that what the government is requiring, prohibiting, or pressuring [them] to do conflicts with [their] religio[us beliefs]."  *Id.* (quoting *Thomas*, 450 U.S. at 716).

### 2. The Mandate Places "Substantial Pressure" on Plaintiffs to Violate Their Religious Beliefs

Once it becomes apparent that Plaintiffs exercise their religious beliefs by, among other things, refusing to take the actions described above, the "substantial burden" analysis is straightforward.  As this Court held in *Gilardi*, "[a] 'substantial burden' is 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" 733 F.3d at 1216 (citation omitted).  Here, the Mandate plainly imposes "substantial pressure" on Plaintiffs to violate their beliefs.  Failure

---

[7] (*See* Fr. Pavone Decl. ¶¶ 7-10, 12, 26-29, 40, 41 (JA44-45, 47-48, 51-52); King Decl. ¶¶ 8, 19-22, (JA69, 72-73); Morana Decl. ¶¶ 7, 20-23 (JA77, JA80-81)); *supra* note 4 (citing affidavits).

to take the actions required by the Mandate subjects Plaintiffs to potentially fatal fines of $100 a day per affected beneficiary. 26 U.S.C. § 4980D(b). If Plaintiffs drop their health plans altogether, they are subject to fines of $2,000 a year per full-time employee after the first thirty employees, *id.* § 4980H(a), (c)(1), and/or face other ruinous practical consequences due to their inability to offer a crucial healthcare benefit.[8]

The Government has thus put Plaintiffs to a stark choice: violate their religious beliefs or suffer penalties, including crippling fines. These penalties clearly impose the type of pressure that qualifies as a substantial burden. Indeed, this is the exact choice, and these are the exact penalties, at issue in *Gilardi*. Just as in *Gilardi*, Plaintiffs "are burdened when they are pressured to choose between violating their religious beliefs in managing their selected plan or paying onerous penalties." 733 F.3d at 1217. And just as in *Gilardi*, "the burden becomes substantial because the government commands compliance by giving [Plaintiffs] a Hobson's choice." *Id.* at 1218. They can either "abide by the sacred tenets of their faith" and "pay a penalty" that would "cripple" their organizations, or else they

---

[8] (Fr. Pavone Decl. ¶¶ 18, 26-29, 35-42 (JA46-48, 49-52); King Decl. ¶¶ 12, 20-22 (JA70, 73-74); Morana Decl. ¶¶ 11, 21-23 (JA78, 81-82); Conley Aff. ¶ 15 (JA282); Blaufuss Aff. ¶ 15 (JA287); Shafran Aff. ¶ 15 (JA 292); Shafran Supp. Aff. ¶ 9 (JA410); Friel Aff. ¶ 15 (JA297); Enzler Aff. ¶ 15 (JA303); Brown Aff. ¶ 15 (JA309); Persico Aff. ¶ 21 (JA321); Panula Aff. ¶ 15, (JA315); Panula Supp. Aff. ¶ 9 (JA429-30)).

must act in a way they believe makes them "complicit in a grave moral wrong." *Id.* "If that is not 'substantial pressure on an adherent to modify his behavior and to violate his beliefs,' we fail to see how the standard could be met." *Id.* (quoting *Thomas*, 450 U.S. at 718); *see also Korte*, 735 F.3d at 683-84 (same); *Hobby Lobby*, 723 F.3d at 1141 (same).

Nor can *Gilardi* be distinguished by arguing that the for-profit plaintiffs in that case were not eligible for the "accommodation." Here, as in *Gilardi*, the Government has placed substantial pressure on Plaintiffs to act contrary to their religious beliefs. The only distinction is the specific acts the Government is pressuring Plaintiffs to take. But that distinction is irrelevant to the RFRA analysis. As *Gilardi* makes clear, a court's task is not to evaluate the nature of a plaintiff's religious beliefs (i.e., neither the Government nor this Court can tell a plaintiff whether an "act" does or does not violate his beliefs), but rather, to assess whether the Mandate coerces a plaintiff into taking *any act* in violation of his beliefs. 723 F.3d at 1216-17. Again, RFRA protects "*any* exercise of religion," 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A) (emphasis added). It is therefore immaterial that the plaintiffs in *Gilardi* exercised their religious beliefs by, among other things, refusing to pay directly for the mandated coverage, while Plaintiffs exercise their religious beliefs by, among other things, refusing to take the actions necessary to comply with the "accommodation." Rather, what matters is that, as in

- 30 -

*Gilardi*, the Government's regulatory scheme forces Plaintiffs to choose between (1) "pay[ing] a [massive] penalty" or (2) taking actions that *they* believe make them "complicit in a grave moral wrong."  733 F.3d at 1218.  In short: the "mandate forces [Plaintiffs] to do what their religion tells them they must not do.  That qualifies as a substantial burden on religious exercise, properly understood."  *Korte*, 735 F.3d at 685.

### B.    The District Courts' Decisions Were Erroneous

The district courts ignored this straightforward analysis.  Instead, they impermissibly arrogated unto themselves the authority to determine whether compliance with the Mandate "actually" violated Plaintiffs' beliefs.  (*RCAW* Ct. at 27, (JA475)).  Thus, "despite protestations to the contrary from the religious objectors who brought the lawsuit[s]," *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 457 (1988), the district courts concluded that Plaintiffs' "misunderstand their own religious beliefs." *Id.* at 458.  According to the district courts, Plaintiffs' objection was not to the actions *they* are required to take, but only to the actions of third parties, (*RCAW* Ct. at 4 (JA452); *PFL* Ct. at 24-27 (JA161-64)).  This impermissible religious judgment also formed the basis for the *RCAW* court's conclusion that numerous Plaintiffs lacked Article III standing. (*RCAW* Ct. at 46-51 (JA494-99)).  In so holding, the district courts ignored

Plaintiffs' undisputed testimony that the actions they *themselves* are required to take under the Mandate are contrary to their sincerely held religious beliefs.

### 1. The *RCAW* District Court Erred in Dismissing Church-Plan Plaintiffs for Lack of Standing

The *RCAW* court erroneously held that eight out of the ten Plaintiffs lack standing because they participate in the Archdiocese's self-insured health plan, which is a "church plan" exempt from ERISA. *Id.*[9] This holding is based on the Government's assertion that, if Plaintiffs' church-plan TPA refuses to provide Plaintiffs' employees with the objectionable payments upon receipt of Plaintiffs' self-certification, then there is, as of now, no enforceable penalty against the TPA. (*RCAW* Ct. at 49-50 (JA497-98)). This holding is clearly wrong.

At the outset, it is worth noting that, contrary to the Government's argument, the regulations contain no exemption for church-plan TPAs. Rather, they require *all* TPAs to provide contraceptive payments upon receipt of an eligible organization's self-certification. 29 C.F.R. § 2590.715-2713A(b)(2) (stating that "[i]f a [TPA] receives a copy of the [self] certification" "the [TPA] shall provide or arrange payments for contraceptive services"). Additionally, the same requirements are spelled out in 26 C.F.R. § 54.9815-2713A(b)(2), a regulation issued not pursuant to ERISA, but under the Internal Revenue Code. The district

---

[9] Plaintiffs CCA, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC participate in the Archdiocese's plan.

court's entire, erroneous theory of standing, therefore, rests on the speculative notion that TPAs operating in a highly regulated industry will flout their legal obligations because the Government claims that, as of now, there is no enforceable penalty for noncompliance.[10]  But the "possibility that third parties may violate the law is too speculative to defeat standing." *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994).  Indeed, the Government has taken affirmative steps to ensure that church plan TPAs will *not* flout their legal obligations.  TPAs that provide the mandated payments upon receipt of a self-certification are eligible for Government funds that cover the TPA's payments plus ten percent.  *See* 45 C.F.R. 156.50.  The likelihood that TPAs will ignore their legal obligations, therefore, is almost nil.

In any event, regardless of whether Plaintiffs' TPA decides to comply with its legal obligations, the Mandate still requires Plaintiffs to engage in conduct that violates *their* religious beliefs.  The Government, for example, concedes that church-plan Plaintiffs "must still complete the self-certification."  (Tr. of *RCAW* Hr'g at 10 (JA440)).  But each church-plan Plaintiff has issued a sworn affidavit stating that its "sincerely held religious beliefs" "not only prohibit it from providing payments and/or coverage for abortion-inducing products, contraception,

---

[10] Notably, the Government is actively "consider[ing] potential options" to close any enforcement gap.  (Gov't *RCAW* Br. at 6 (JA390)).

sterilization, and related counseling, but also from providing a certification that authorizes a [TPA] to do so—even if the [TPA] ultimately has the discretion not to provide such payments and/or coverage."[11]  Thus, because Plaintiffs are objecting to a regulation that clearly applies *to them*, they obviously have standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (explaining that when "the plaintiff is himself an object of" regulation, "there is ordinarily little question" that the regulation "has caused him injury"); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) (stating that a plaintiff "may have a spiritual stake in First Amendment values sufficient to give standing").

This is why every other court to consider this question has rejected the Government's argument.  *RCNY*, 2013 WL 6579764, at *6-7; *Reaching Souls*, 2013 WL 6804259, at *4-5; *Mich. Catholic Conf.*, 2013 WL 6838707, at *4; *Little Sisters*, 2013 WL 6839900, at *5-7; *E. Tex. Baptist*, 2013 WL 6838893, at *12-13; *Beaumont*, 2014 WL 31652, at *5.  As Judge Cogan explained:

> [Plaintiffs] alleged injury is that the Mandate renders them complicit in a scheme aimed at providing coverage to which they have a religious objection.  This alleged spiritual complicity is independent of whether the scheme actually succeeds at providing contraceptive coverage. . . .  Plaintiffs allege that their religion forbids them from completing this self-certification, because to them, authorizing others

---

[11] (Conley Supp. Aff. ¶¶ 6-7 (JA398-99); Blaufuss Supp. Aff. ¶¶ 6-7 (JA403-04); Shafran Supp. Aff. ¶¶ 6-7(JA408-09); Friel Supp. Aff. ¶¶ 6-7 (JA413-14); Enzler Supp. Aff. ¶¶ 6-7 (JA418-19); Brown Supp. Aff. ¶¶ 6-7 (JA423-24); Panula Supp. Aff. ¶¶ 6-7 (JA428-29)).

> to provide services that plaintiffs themselves cannot is tantamount to an endorsement or facilitation of such services. Therefore, regardless of the effect on plaintiffs' TPA, the regulations still require plaintiffs to take actions they believe are contrary to their religion.

*RCNY*, 2013 WL 6579764, at *7. The *RCAW* court reached a contrary conclusion only because it refused to accept Plaintiffs' undisputed affidavits describing their religious beliefs.

### 2. The Mandate Substantially Burdens Plaintiffs' Religious Exercise

The *RCAW* court held, in the alternative, that, as with Plaintiff CUA, the Mandate did not impose a "substantial burden" on the religious beliefs of the church-plan Plaintiffs. (*RCAW* Ct. at 50-51 (JA498-499)). The *PFL* court reached the same conclusion. (*PFL* Ct. at 16-30 (JA153-67)). These decisions, however, are based on the courts' refusal to accept Plaintiffs' representations of what their religious beliefs require. Thus, contrary to Plaintiffs' uncontested testimony, the district courts concluded the "accommodation" puts enough distance between Plaintiffs' actions and the provision of free contraceptive payments so as to absolve Plaintiffs of moral culpability. The *RCAW* court, for example, "determine[d that] compliance" with the Mandate does not "actually constitute[] compelled 'facilitation,'" (*RCAW* Ct. at 27 (JA475)) or "give rise to 'scandal . . . in a way inconsistent with Church teachings,'" (*id.* at 31 n.10 (JA479)). Likewise, based on a patent misreading of the record, the *PFL* court asserted that Priests for

Life had no religious objection to signing the self-certification.  (*PFL* Ct. at 26-27 (JA163-64)).  These rulings are plainly wrong.

*First*, the courts' conclusion that the accommodation "effectively severs an organization" "from participation in the provision of the contraceptive coverage," (*RCAW* Ct. at 29 (JA477); *PFL* Ct. at 26-28 (JA163-65)), rests on an impermissible assessment of Plaintiffs' religious beliefs.  Plaintiffs have made the religious determination that taking the actions required by the accommodation would facilitate access to abortion-inducing products, contraception, sterilization procedures, and related counseling in a manner contrary to the Catholic doctrines of material cooperation and scandal.  *Supra* Part I.A.1.  As in *Thomas*, Plaintiffs "drew a line" between religiously permissible and impermissible conduct, and "it [wa]s not for [courts] to say [the line was] unreasonable," 450 U.S. at 715, 718; if Plaintiffs interpret the "creeds" of Catholicism to prohibit compliance with the Mandate (including the "accommodation"), "[i]t is not within the judicial ken to question" "the validity of [their] interpretation[]."  *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989).

Instead of accepting the line Plaintiffs drew, the district courts sought to "determine whether compliance with the [Mandate] *actually constitutes* compelled 'facilitation.'"  (*RCAW* Ct. at 27 (JA475) (emphasis added)).  In other words, they "purport[ed] to resolve the religious question underlying these cases:  Does

- 36 -

[complying with the Mandate] impermissibly assist the commission of a wrongful act in violation of the moral doctrines of the Catholic Church?" *Korte*, 735 F.3d at 685. The courts' answer was ultimately "no," but "[n]o civil authority can decide that question." *Id.*; *Gilardi*, 733 F.3d at 1216. Whether the accommodation "effectively severs" Plaintiffs from the provision of contraceptive coverage, (*RCAW* Ct. at 29 (JA477)) or makes them "complicit in a grave moral wrong," *Gilardi*, 733 F.3d at 1218, is "a question of religious conscience for [Plaintiffs] to decide." *Korte*, 735 F.3d at 685; *Hobby Lobby*, 723 F.3d at 1142 ("[T]he question here is not whether the reasonable observer would consider the plaintiffs complicit in an immoral act, but rather how the plaintiffs themselves measure their degree of complicity."). Indeed, this Court has squarely held that "it is not for courts to decide [what] severs [a religious objector's] moral responsibility." *Gilardi*, 733 F.3d at 1215. The district courts might believe the self-certification is "just a form," *RCNY*, 2013 WL 6579764, at *14; (*RCAW* Ct. at 30 (JA478)), but for Plaintiffs, submitting that "form" makes them "complicit in a grave moral wrong," *Gilardi*, 733 F.3d at 1218, and "undermine[s their] ability to give witness to the moral teachings of [the Catholic] church." *Korte*, 735 F.3d at 683. "It is not for [a] Court to say otherwise." *RCNY*, 2013 WL 6579764, at *14.

In any event, the district courts grossly mischaracterize the nature of the actions Plaintiffs must take to comply with the accommodation, beginning with the

self-certification. "Submitting the self-certification[] is not simply espousing a belief [Plaintiffs] hold." *Beaumont*, 2014 WL 31652, at *8. What the lower courts dismissively deem mere paperwork constitutes a "designation of [self-insured Plaintiffs' TPA] as plan administrator[] and claims administrator[] for contraceptive benefits," 78 Fed. Reg. at 39,879, and serves as an "instrument under which [those Plaintiffs'] plan[s are] operated," 29 C.F.R. § 2510.3-16. It "tells the TPA or issuer that it must provide [Plaintiffs'] employees" and students with "free access to emergency contraceptive devices and products [and inform them] of that benefit." *E. Tex. Baptist*, 2013 WL 6838893, at *20. Thus, the self-certification is far more than an "organization rais[ing] its hand and say[ing] 'I object.'" (*RCAW* Ct. at 34 (JA482)). Instead, it enables a third party to provide the very coverage Plaintiffs oppose. *E.g.*, *Beaumont*, 2014 WL 31652, at *8; *E. Tex. Baptist*, 2013 WL 6838893, at *20; *Reaching Souls*, 2013 WL 6804259, at *7.

In this respect, the Mandate is analogous to a law that requires Plaintiffs—all of whom oppose the death penalty—to issue a certification so stating, but which prohibits the executioner from administering the death penalty until he received the certification. It would obviously violate Plaintiffs' religious beliefs to issue that certification. So too here. And this is to say nothing of the numerous additional actions Plaintiffs must take to ensure contraceptive benefits continue to be offered to their employees. *Supra* Part I.A.1.

*Second*, the district courts were wrong to conclude that Plaintiffs object only to the actions of third parties and, hence, erred in relying on *Bowen v. Roy*, 476 U.S. 693 (1986) and *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008). (*RCAW* Ct. at 24-26, 33-35 (JA472-74, JA481-83); *PFL* Ct. at 20-22, 24-26, JA157-59, JA161-63)).   Those cases stand for nothing more than the proposition that an individual cannot challenge an "'activit[y] of [a third party], in which [he] play[ed] *no role*.'"   *Kaemmerling*, 553 F.3d at 679 (emphasis added).   In *Bowen*, for example, the Court held only that an individual's religious beliefs could not be used "to dictate the conduct of the Government's internal procedures."   476 U.S. at 700.   Specifically, the Court concluded that the appellee could not establish that his religious exercise was substantially burdened because his objection was to the conduct of a third party, namely, to the government's use of a Social Security number it already had to administer his daughter's public welfare benefits.   *Id.*[12]

Likewise, in *Kaemmerling*, the plaintiff did not have a religious objection to any

---

[12] Indeed, if anything, *Bowen* supports Plaintiffs' position.   The appellee in that case objected not only to the government's use of his daughter's Social Security number, but also to the *separate* requirement that *he provide* the government with his daughter's Social Security number in order for her to receive benefits.   476 U.S. at 701-12 (opinion of Burger, C.J.).   Though it did not decide the question due to a dispute over mootness, a majority of the Court would have held that this requirement imposed a substantial burden on the appellee's exercise of religion. *See id.* at 715-16 (Blackmun, J., concurring in part); *id.* at 724-33 (O'Connor, J., concurring in part, dissenting in part); *id.* at 733 (White, J., dissenting); *Notre Dame*, 2014 WL 687134, at *18-20 (Flaum, J., dissenting).

action he was forced to take, but only "to the government extracting DNA information from . . . specimen[s]" *it already had*.  553 F.3d at 679.  This court thus concluded that Kaemmerling failed to state a RFRA claim because he could not "identify any 'exercise' which is the subject of the burden to which he objects." *Id.*

Here, in contrast, the provision of contraceptive coverage is not an "activit[y] of [a third party], in which [Plaintiffs] play no role." *Id.*  Whereas Kaemmerling "did not object to what the government forced him to do," here, Plaintiffs "vigorously object on religious grounds to the act[s] that the government requires [*them*] to perform, not merely to later acts by third parties." *E. Tex. Baptist*, 2013 WL 6838893, at *18; *RCNY*, 2013 WL 6579764, at *14-15 (distinguishing *Kaemmerling*); *supra* Part I.A.1.  Accordingly, unlike in *Kaemmerling* and *Bowen*, Plaintiffs are required to violate their beliefs by playing an integral role in the provision of the mandated coverage.

*Third*, the district courts erred in claiming that Plaintiffs could not prevail because the Mandate "does not require plaintiffs to 'modify their behavior.'" (*RCAW* Ct. at 4, 34, JA452, 482; *PFL* Ct. at 23-24, JA160-61).  As an initial matter, that assertion is simply false.  In the past, Plaintiffs always entered into contractual arrangements barring third parties from providing the objectionable products and services to their plan beneficiaries.  Now, Plaintiffs must submit a

self-certification authorizing those third parties to provide the objectionable products and services.  Formerly, Plaintiffs would not remain in a contractual relationship with a third party that would provide their employees with the objectionable products and services.  Now, they must maintain such relationships (either by maintaining their current contractual relationships or entering new contracts with insurance companies or TPAs that will provide the objectionable coverage to their plan beneficiaries).  And whereas before, Plaintiffs did not offer a health plan that served as a vehicle for the delivery of the objectionable products and services, now they must offer just such health plans.  All of these newly-required actions and forbearances are deeply objectionable to Plaintiffs in light of their Catholic beliefs.  *Supra* Part I.A.1.

But in any event, the district courts' focus on whether Plaintiffs must "modify" their actions misunderstands the substantial burden test.  The question is not whether a believer must modify his behavior compared to actions he has taken in the past, but whether he must modify his behavior compared to what he would do if free to follow his religious conscience.  Thus, the substantial burden test "focuses primarily on the *intensity of the coercion* applied by the government *to act contrary to [religious] beliefs*."  *Korte*, 735 F.3d at 683 (second emphasis added) (citation omitted).  In other words, the touchstone of the substantial burden analysis is whether a law "forces [Plaintiffs] to do what their religion tells them

they must not do." *Id.* at 685; *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001) (considering whether "the regulation forces [plaintiffs] to engage in conduct that their religion forbids"); *see also Thomas*, 450 U.S. at 717 (stating that the inquiry "begin[s]" with an assessment of whether a law "*compel*[*s*] a violation of conscience") (citation omitted); *Sherbert*, 374 U.S. at 404 (same); *Yoder*, 406 U.S. at 218 (same).

Here, Plaintiffs' undisputed testimony establishes that that is exactly what the Mandate requires. *Supra* Part I.A.1. Thus, whereas before, the provision of health insurance to their employees did *not* violate Plaintiffs' religious beliefs because it did *not* impermissibly facilitate access to objectionable products and services, today, in light of the Mandate, it is undisputed that the provision of health insurance to their employees *does* violate Plaintiffs' religious beliefs. The district courts' standard, in contrast, would have the perverse effect of allowing the Government to compel a violation of conscience by "transform[ing] a voluntary act [Plaintiffs] believe to be consistent with their religious beliefs into a compelled act that they believe forbidden." *RCNY*, 2013 WL 6579764, at *14.

*Fourth*, the district courts appear to base their flawed conclusion that Plaintiffs need not modify their behavior on a further "probing" of Plaintiffs' religious beliefs (*RCAW* Ct. at 31 (JA479)), claiming that Plaintiffs object only to the "consequences" of their actions, not to the actions themselves, (*id.* at 33-34

(JA481-82); *PFL* Ct. at 27 (JA164)). This is both incorrect and irrelevant. In the first place, Plaintiffs' undisputed testimony establishes their religious objections to the actions themselves, not only to their consequences. *Supra* Part I.A.1. And in any event, there is no authority for the bizarre notion that RFRA does not protect the religious exercise of plaintiffs who object to taking certain actions because of their consequences. After all, the consequences of an action, or the context in which the action takes place, are obviously relevant to whether the action itself is morally acceptable. *See Thomas*, 450 U.S. at 714-15. For example, giving a neighbor a ride to the bank may not, in and of itself, be morally objectionable, but it would be if one knows that the neighbor intends to rob the bank. Or, working in a foundry that produced steel may not be morally objectionable, while the very same work might become objectionable if it resulted in the production of a tank turret. *See id*.

Indeed, the idea that objectors cannot consider the consequences of their actions when stating a religious objection runs flatly contrary to Supreme Court precedent. For example, in *Lee,* the Amish plaintiff had no inherent objection to the payment of taxes; rather, he objected to the payment of taxes when the "consequence" of that action was to "enable other Amish to shirk their duties toward the elderly and needy." *Hobby Lobby*, 723 F.3d at 1139. And, as alluded to above, the pacifist plaintiff in *Thomas* specifically stated that he did not object to

- 43 -

the physical work required of him; instead, he objected to what others would do with the result of his work. *Thomas*, 450 U.S. at 711, 714-715; *Zubik*, 2013 WL 6118696, at *25 (noting the difference between providing a neighbor with a knife for a barbecue, and providing "the same neighbor [with] a knife to kill someone"). So too here: Plaintiffs do not object to declaring their opposition to contraception. They do object, however, to submitting a self-certification (and taking the other steps necessary to comply with the accommodation) when, as here, those actions facilitate the provision of the mandated coverage to their plan beneficiaries in a manner contrary to their Catholic beliefs. [13]

---

[13] Despite the *RCAW* court's claim, the Mandate substantially burdens the religious exercise of Don Bosco and CIC. (*RCAW* Ct. at 51 n.24 (JA499)). Though not statutorily required to provide health care, 26 U.S.C. § 4980H, these Plaintiffs will be fined $100 a day per affected beneficiary if they provide noncompliant health coverage, *id.* § 4980D(b). That burden alone was deemed substantial in both *Gilardi* and *Korte*. *Gilardi*, 733 F.3d at 1210 & n.2, 1218; *Korte*, 735 F.3d at 683. Moreover, dropping coverage to avoid the Mandate would inhibit their ability to exercise their religion and would be economically ruinous. (Shafran Aff. ¶¶ 14-15, JA292; Panula Aff. ¶¶ 14-15 (JA315); Shafran Supp. Aff. ¶ 9 (JA410); Panula Supp. Aff. ¶ 9 (JA429-30)); *Hobby Lobby*, 723 F.3d at 1140-41; *Legatus*, 2013 WL 6768607; *S. Nazarene*, 2013 WL 6804265, at *8-9 *Geneva Coll. v. Sebelius*, No. 2:12-CV-00207, 2013 WL 3071481, at *8-10 (W.D. Pa. June 18, 2013). Finally, although the Archdiocese meets the Mandate's definition of a "religious employer," it is still injured by the Mandate because many of the Archdiocese's non-exempt affiliates offer their employees health coverage through the Archdiocese's plan. The Archdiocese must therefore either maintain an insurance plan with a TPA authorized to provide contraceptive benefits to its affiliates' employees, or else decline to extend its heath plan to those affiliates. (Belford Aff. ¶ 19 (JA276)).

*Finally*, and to underscore this point, the *PFL* court's decision flowed from its false assertion that "during oral argument Plaintiffs conceded that they have no religious objection to the self-certification form, in and of itself." (*PFL* Ct. at 26-27 (JA163-64)). This, however, is clearly wrong. The sworn testimony of Father Pavone makes crystal clear that Priests for Life does object to the self-certification form on religious grounds. (Priests for Life Supp. Decl. ¶¶ 5-6 (JA106)). Indeed, the challenged mandate and its "accommodation" forces Priests for Life to engage in behavior under penalty of federal law that is forbidden by Priests for Life's sincerely held religious beliefs—a substantial burden on religious exercise under any reasonable view of the law, including the view of this circuit. *Gilardi*, 733 F.3d at 1218.

The oral argument transcript thus shows without equivocation that Priests for Life made no such concession. Indeed, despite the district court's repeated attempts to persuade Priests for Life to concede this point (no doubt in an effort to shoehorn this case into the analysis of *Kaemmerling*), Priests for Life emphatically rebuffed all such efforts, explaining:

> So if you're asking me to fill out a form and say I object to contraception but the purpose of that is to hand it to somebody who's going to enable the contraception, then, yes, I do have an objection. I mean, that's the point I'm trying to bring home here, that there is a distinction between saying I object to contraception, exclude me; and I object to contraception, and oh, by the way, that's going to enable

the unlawful act.   Because now I am morally complicit.   I am cooperating in an unlawful act, and I can't do that.

(Tr. of *PFL* Hr'g 71 (JA135); *see also id.* at 13-16, 20-22, 24, 25, 41 (JA125-34)).

### 3.    The Seventh Circuit's *Notre Dame* Decision Is Fundamentally Flawed

On February 21, 2014, a divided panel of the Seventh Circuit rejected a nonprofit plaintiff's request for a preliminary injunction under RFRA.  *See Notre Dame*, 2014 WL 687134.  That decision, however, is riddled with errors.  *First*, the Court misapplied RFRA in the same way as the courts below, holding that compliance with the "accommodation" was not a serious burden on Notre Dame's religious beliefs because "[i]t amounts to signing one's name and mailing the signed form to two addresses." *Id.* at *11.  That, however, is not a determination that the Seventh Circuit was authorized to make.  *See supra* Parts I.A. & I.B.2; *Notre Dame*, 2014 WL 687134,  at *18 (Flaum, J., dissenting) ("Notre Dame tells us that Catholic doctrine prohibits the action that the government requires it to take.  So long as that belief is sincerely held, I believe we should defer to Notre Dame's understanding.").    *Second*, the *Notre Dame* court fundamentally misunderstood the regulatory scheme, erroneously holding that even if an objector refused to sign the self-certification, its TPA "must provide the services no matter what." *Id.* at *8.  That, however, is clearly wrong:  a TPA's obligation to provide contraceptive coverage, and its ability to get reimbursed for doing so, arise only

upon receipt of a self-certification, as is plain from the face of the regulations and as the Government has repeatedly conceded. (*E.g.*, Tr. of *RCAW* Hr'g at 12-13 ("THE COURT: But [a TPA's] duty to [provide the mandated coverage] only arises by virtue of the fact that he has a contract with the religious organizations? [THE GOVERNMENT]: Yes. They become a plan administrator and are required to make these payments by virtue of the fact that they receive the self-certification form from the employer.") (JA442-43)). *Finally*, even if the Seventh Circuit's understanding of the "accommodation" were correct—and it is not—nonprofit plaintiffs would simply be in the same position as for-profit plaintiffs, whereby they are required, under pain of massive penalties, to procure an insurance policy that facilitates access to contraceptive coverage. The Mandate would therefore still substantially burden their beliefs for the same reasons this Court held in *Gilardi*.

\*       \*       \*

Ultimately, the Government has forced Plaintiffs to choose between onerous penalties (or other dire consequences) and violating their religious beliefs. Just as an individual may be held accountable for aiding and abetting a crime he did not personally commit, 18 U.S.C. § 2, so too may a Catholic violate the moral law if in certain circumstances he facilitates the commission by others of acts contrary to Catholic beliefs. As Judge Gorsuch explained in *Hobby Lobby*,

> All of us face the problem of complicity.  All of us must answer for ourselves whether and to what degree we are willing to be involved in the wrongdoing of others.  For some, religion provides an essential source of guidance both about what constitutes wrongful conduct and the degree to which those who assist others in committing wrongful conduct themselves bear moral culpability.

723 F.3d at 1152 (Gorsuch, J., concurring).  Plaintiffs' faith has led them to the conclusion that the actions required of them by the Mandate cross the "line" between permissible and impermissible facilitation of wrongful conduct.  For the reasons described above, that line is indisputably theirs to draw, and it is not for this Court or the Government to question.  By placing substantial pressure on Plaintiffs to cross this line, the Government has substantially burdened Plaintiffs' exercise of religion.  As the Mandate cannot satisfy strict scrutiny, Plaintiffs are entitled to relief under RFRA.

## II.    THE MANDATE VIOLATES THE FREE EXERCISE CLAUSE

While the Free Exercise Clause does not require heightened scrutiny of laws that are "neutral [and] generally applicable," *Smith*, 494 U.S. at 881, it requires strict scrutiny of laws that *disfavor* some or all religious groups, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).  Thus, "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny."  *Id.* at 546.

As the Supreme Court indicated in *Lukumi*, a law cannot be considered neutral and generally applicable when it contains numerous exemptions for secular

interests but withholds similar exemptions for religious interests.  Such a scheme is problematic because it threatens to "devalue[] religious reasons . . . by judging them to be of lesser import than nonreligious reasons." *Id.* at 537-38.  Accordingly, once the Government acknowledges that some exemptions can be granted, it may not "refuse to extend [such exemptions] to cases of 'religious hardship' without compelling reason." *Id.*

For example, in *Fraternal Order of Police v. Newark*, 170 F.3d 359, 365-67 (3d Cir. 1999) (Alito, J.), the Third Circuit invalidated a police-department policy that prohibited a Muslim police officer from wearing a beard, because the no-beard policy contained a secular exemption for officers who could not shave for medical reasons.  Relying on *Lukumi*, the court found that the police department's decision to provide "medical—but not religious—exemptions from its 'no-beard' policy . . . unconstitutionally devalued [] religious reasons for wearing beards by judging them to be of lesser import than medical reasons."  *Id.* at 365; *see also Ward v. Polite*, 667 F.3d 727, 739 (6th Cir. 2012) (finding that implementation of university's anti-discrimination policy may have violated Free Exercise Clause by "permitting secular exemptions but not religious ones and failing to apply the policy in an even-handed, much less a faith-neutral, manner").

Here, the Mandate is not neutral and generally applicable because the Government has exempted millions of individuals for secular and religious

reasons, but it refuses to extend a similar religious exemption to Plaintiffs.  *Supra* pp. 6-9; *see also Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 435-37 (W.D. Pa. 2013) (holding that "the sheer number of exemptions—both secular and religious—to the mandate's requirements burdened [plaintiffs] free exercise rights to an extent sufficient to trigger strict scrutiny"); *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, No 2:11-cv-92, 2012 WL 6738489, at *5-6 (E.D. Mo. Dec. 31, 2012) (same).

The *RCAW* court rejected Plaintiffs' free exercise argument because "none of the exemptions to the contraceptive mandate are *individualized*, and none of the exemptions require the government to exercise its discretion in a way that would allow it to devalue religious reasons."  (*RCAW* Ct. at 58 (JA506) (emphasis added)); *see also PFL* Ct. at 30-35 (rejecting Plaintiffs' free exercise challenge on similar grounds) (JA167-72)).   That finding is wrong.   As the Third Circuit recognized in *Fraternal Order of Police*, "[w]hile the Supreme Court did speak in terms of 'individualized exemptions' in *Smith* and *Lukumi*, it is clear from those decisions that the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations."  170 F.3d at 365.  "If anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection but

not for individuals with a religious objection." *Id.* That is precisely the case here.

## III.  THE MANDATE VIOLATES PLAINTIFFS' FIRST AMENDMENT RIGHTS OF EXPRESSIVE ASSOCIATION[14]

"Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs." *Healy v. James*, 408 U.S. 169, 181 (1972) (citations omitted). Indeed, "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984); *NAACP v. Alabama*, 357 U.S. 449, 460 (1958) ("Effective advocacy . . . is undeniably enhanced by group association . . . .").

Here, the Mandate undercuts *PFL* Plaintiffs' right of expressive association by forcing them to engage in conduct and speech that is contrary to Priests for Life's very reason for existing as an expressive association and thus further making group membership less attractive. The Mandate directly harms this association by (1) forcing it to cooperate with and promote the government's immoral objective of promoting contraceptive services—an objective that is antithetical to the very reason for its existence; (2) forcing it to choose between cooperating with the

---

[14] This claim is unique to the *PFL* proceedings.

immoral objective and its very existence as an organization; (3) compelling it to engage in speech that is antithetical to its very purpose, (*see infra* Part IV), (4) forcing it to hire an insurance company that will provide the objectionable services to its members; and (5) forcing it into a moral and economic dilemma with regard to its employer/employee relationship (*i.e.,* pressuring Priests for Life to drop its employee healthcare coverage because of the Mandate), which, in turn, adversely affects the association and its members.  In short, the challenged mandate directly threatens its very existence as an expressive association.  *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 68 (2006) ("If the government were free to restrict individuals' ability to join together and speak, it could essentially silence views that the First Amendment is intended to protect.").

The district court's reliance on *FAIR* is misplaced.  (*PFL* Ct. at 36-41 (JA173-78)).  As the Supreme Court made clear in *FAIR*, the challenged statute—unlike the Mandate here—"neither limits what law schools may say nor requires them to say anything."  547 U.S. at 60.  Moreover, unlike the statute at issue in *FAIR*, the challenged mandate does not simply compel "equal access"—it compels the promotion of a particular viewpoint that is abhorrent to Priests for Life and contrary to its very reason for existing as an expressive association.  Indeed, is there any question that the First Amendment would forbid the Government from forcing Priests for Life to turn over the names and addresses of its employees to the

Democratic National Committee—a private third party—so that it could send to Priests for Life's employees information about pro-choice candidates?  Of course not.  *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ("[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment.").  This mandate is thus forcing Priests for Life, *inter alia*, to disclose the identity of its employees (and their family members who are beneficiaries of the healthcare plan) *for the express purpose* of facilitating the government's illicit objective of promoting the use of contraceptive services.  This plainly makes "group membership less attractive, raising the same First Amendment concerns about affecting the group's ability to express its message." *FAIR*, 547 U.S. at 69.

## IV.    THE MANDATE VIOLATES THE FIRST AMENDMENT PROTECTION AGAINST COMPELLED SPEECH

It is "a basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say.'" *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) (citation omitted); *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 957-58 (D.C. Cir. 2013).  Thus, "[a]ny attempt by the government either to compel individuals to express certain views, or to subsidize speech to which they object, is subject to strict scrutiny." *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1211 (D.C. Cir. 2012) (citations omitted).    The protection against compelled speech "applies not only to

- 53 -

expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573-74 (1995).

The Mandate violates the First Amendment prohibition on compelled speech in three ways. *First*, it requires Plaintiffs to authorize and facilitate coverage for "counseling" related to contraceptive services. Because Plaintiffs oppose abortion and contraception, they strongly object to providing any support for "counseling" that encourages, promotes, or facilitates such practices. Indeed, opposition to abortion and contraception is an important part of the religious message that Plaintiffs preach, and they routinely counsel men and women against engaging in such practices. Consequently, forcing Plaintiffs to facilitate "counseling" that does anything other than discourage such practices imposes a serious burden on their freedom of speech.

The *RCAW* court rejected this argument on the grounds that Plaintiffs do not engage in "inherently expressive conduct when they provide their employees with health insurance," and that "it is unlikely that any objectionable third-party counseling would be attributed to plaintiffs." (*RCAW* Ct. at 65 (JA513)). That is both wrong and irrelevant. Plaintiffs express their faith and their views on contraception by choosing what type of insurance they will provide, and by funding and supporting "counseling" that is expressly opposed to the mandated

products and services.  By forcing Plaintiffs to instead sponsor insurance for pro-contraceptive "counseling," the Mandate creates a real likelihood that the message of this counseling will be attributed to Plaintiffs.  But in any event, the bar on compelled speech applies whenever the Government forces someone to "help disseminate hostile views," regardless of whether the act of assisting in the dissemination is itself expressive.  *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2821 n.8 (2011).

*Second*, in order to qualify for the "accommodation," the Mandate requires Plaintiffs to provide a "certification" stating their objection to the mandated contraceptive services.  Plaintiffs object to this certification requirement because it compels them to engage in certain speech and deprives them of the freedom to speak on the issue of abortion and contraception on their own terms, at a time and place of their own choosing.  *See id.* at 2820; *see also Agency for Int'l Dev.*, 133 S. Ct. at 2326 (striking down requirement that applicants for a government program certify their opposition to prostitution and sex trafficking).

The district court found no violation because the self-certification requirement "does not require plaintiffs to say anything with which they disagree." (*RCAW* Ct. at 70 (JA518)).  That, however, is irrelevant.  Plaintiffs emphatically do *not* want to issue the speech in the certification because it entangles them in the provision of products and services to which they strenuously object.  The First

Amendment does not give the Government carte blanche to force people to state their views on controversial issues when they do not want to do so, regardless of the content of that speech, unless necessary to achieve an important regulatory purpose (and here, the very purpose for the speech—to facilitate access to and use of contraceptives—is contrary to Plaintiffs' views on the issue). *E.g.*, *Evergreen Ass'n v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014); *Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456, 468 (D. Md. 2011), *aff'd* 722 F.3d 184 (4th Cir. 2013) (en banc).

*Third*, the Mandate requires that Plaintiffs' plan participants and beneficiaries receive written notice of, *inter alia*, the availability of separate payments for contraceptive services, including information that Plaintiffs' issuer provides coverage for the services and contact information for questions about the coverage. *See* 78 Fed. Reg. at 39,897. The Mandate thus coerces access to Plaintiffs' healthcare plan participants and beneficiaries, thereby forcing either the appearance that Plaintiffs agree with the notice or Plaintiffs to respond to it. *See Pac. Gas & Electric Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 15-16 (1986) (plurality op.) (invalidating coerced access to the envelope of a private utility's bill and newsletter because the utility may be forced either to appear to agree with the intruding leaflet or to respond); *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988) ("Mandating speech that a speaker would not otherwise make necessarily

alters the content of the speech.").[15]

## V.   THE MANDATE VIOLATES THE ESTABLISHMENT CLAUSE

The Mandate violates the Establishment Clause in two ways. *First,* it violates the requirement of "governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). This requirement prohibits the Government from discriminating not just among sects or denominations, but also "between 'types of institutions' on the basis of the nature of the religious practice these institutions are moved to engage in." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (McConnell, J.). Because religious liberty encompasses not only the freedom of religious belief, but also the freedom to adopt different practices and institutional structures, official favoritism for certain "types" of religious organizations is just as insidious as favoritism based on creed. *Id.*

For example, in *Larson v. Valente*, 456 U.S. 228 (1982), the Supreme Court struck down a Minnesota law imposing special registration requirements on any religious organization that did not "receive[] more than half of [its] total contributions from members or affiliated organizations." *Id.* at 231-32. The

---

[15] The *RCAW* court correctly held that the Mandate's gag rule, 26 C.F.R. § 54.9815-2713A(b)(1)(iii), violated the First Amendment by "impos[ing] a content-based limit on [Plaintiffs] that directly burdens, chills, and inhibits their free speech." (*RCAW* Ct. at 72-73 (JA520-21)). If the Government contests this ruling, Plaintiffs will elaborate further in their reply brief.

Supreme Court rejected the State's argument that the law was facially neutral and merely had a disparate impact on some religious groups, finding that the law impermissibly privileged "well-established churches that have achieved strong but not total financial support from their members," while disadvantaging "churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members." *Id.* at 246 n.23. This Court has similarly held that "an exemption solely for 'pervasively sectarian' schools would itself raise First Amendment concerns—discriminating between *kinds* of religious schools." *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1342 (D.C. Cir. 2002) (emphasis added).

Here, the Mandate discriminates among "kinds" of religious institutions by establishing an official category of exempt "religious employer[s]" that excludes Plaintiffs. The exemption is defined to include only "nonprofit organization[s] as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." As the Government has explained, those provisions of the tax code include only "churches, synagogues, mosques, and other houses of worship, and religious orders." 78 Fed. Reg. at 8461. This definition plainly favors religious groups that organize themselves as "houses of worship" or "religious orders" to carry out their ministry, while disadvantaging groups that exercise their religious faith through alternative means—including    through

organizations, like Plaintiffs, which exercise their faith through charitable and educational services.   In short, because the "religious employer" exemption "makes explicit and deliberate distinctions between different religious organizations," it violates the Establishment Clause.  *Larson*, 456 U.S at 246 n.23.

The district courts rejected Plaintiffs' Establishment Clause claims only by ignoring the prohibition against discrimination based on the form and structure of religious organizations.   For example, although the *RCAW* court acknowledged that the Mandate "discriminates against those plaintiffs that are organized as charities and not as houses of worship," it found no Establishment Clause problem because the Mandate does not "facially discriminate among religions."  (*RCAW* Ct. at 79-80 (JA527-28); *PFL* Ct. at 42 (JA179) (holding that *Larson* allows the Government to "distinguish between religious organizations based on structure and purpose when granting religious accommodations")).   Such reasoning is flatly inconsistent with this Court's holding that the Government may not "discriminat[e] between *kinds* of religious [institutions]." *Univ. of Great Falls*, 278 F.3d at 1342 (emphasis added).   Indeed, in *Larson* the Supreme Court struck down a facially neutral ordinance that distinguished between religious groups based on "secular considerations" such as "how much money was raised internally and how much from outsiders."  *Colo. Christian*, 534 F.3d at 1259 (discussing *Larson*).   The ordinance contained no facial distinction between different religious

denominations; the problem was that, as here, the law treated some types of religious institutions differently from others based on how they structured themselves. *See* 77 Fed. Reg. at 8728 (rejecting a broader exemption based on the Government's judgment that religious organizations, such as Plaintiffs, "do not primarily employ employees who share the religious tenets of the organization").

*Second*, the Mandate violates the Supreme Court's admonition that "courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality op.). "It is not only the conclusions that may be reached . . . which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979). The Establishment Clause "protects religious institutions from governmental monitoring or second-guessing of their religious beliefs and practices, whether as a condition to receiving benefits . . . or as a basis for regulation or exclusion from benefits." *Colo. Christian*, 534 F.3d at 1261. In determining eligibility for a religious exemption, the Government may not ask intrusive questions designed to determine whether a group is "*sufficiently* religious," *Univ. of Great Falls*, 278 F.3d at 1343-44, or even whether the group has a "substantial religious character," *id.* at 1344. Rather, any inquiry into a group's eligibility for a religious exemption must be limited to determining whether the group is a "bona fide religious

institution[].” *Id.* at 1343-44.

Here, the Government's criteria for the "religious employer" exemption go far beyond the line of determining bona fide religious status. By its terms, the exemption applies to groups that are "described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code." This category includes (i) "churches, their integrated auxiliaries, and conventions or associations of churches," and (iii) "the exclusively religious activities of any religious order." The IRS, moreover, has adopted an intrusive fourteen-factor test to determine whether a group meets these criteria. *Found. of Human Understanding v. United States*, 88 Fed. Cl. 203, 220 (2009). The fourteen criteria turn on factors such as whether a religious group has "a recognized creed and form of worship," "a definite and distinct ecclesiastical government," "a formal code of doctrine and discipline," or "a distinct religious history." *Id.*

Not only do these factors favor some types of religious groups over others, but they do so on the basis of intrusive judgments regarding beliefs, practices, and organizational structures. *See* 77 Fed. Reg. at 8728 (rejecting a broader exemption based on the Government's judgment as to which organizations were sufficiently religious to warrant an exemption). For example, evaluating whether a group has "a distinct religious history" or "ecclesiastical government" favors long-established and formally organized religious groups. Likewise, probing into whether a group

has "a recognized creed and form of worship" requires the Government to determine what qualifies as a "creed" or "worship." *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977) ("The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment.").

The district court below refused to consider Plaintiffs' challenge to the intrusive nature of the religious-employer exemption because it "has not yet been applied to any plaintiff in this case," and thus "it is not ripe and must be dismissed." (*RCAW* Ct. at 84 (JA532)). That is plainly incorrect. Plaintiffs need not wait to bring suit until after the Government or a court has "troll[ed] through [their] religious beliefs." *Mitchell*, 530 U.S. at 828.

## VI.    THE MANDATE UNCONSTITUTIONALLY INTERFERES WITH PLAINTIFFS' INTERNAL CHURCH GOVERNANCE[16]

The Supreme Court has recognized that the Religion Clauses prohibit the Government from interfering with matters of internal church governance. In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694 (2012), for example, the Court held that the Government may not apply anti-discrimination laws to interfere with the freedom of religious groups in the hiring and firing of ministers. The Court explained that the First Amendment prohibits

---

[16] This claim is unique to the *RCAW* Plaintiffs.

"government interference with an internal church decision that affects the faith and mission of the church itself." *Id.* at 707. Indeed, the Court has "long recognized that the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs." *Id.* at 712 (Alito, J., concurring).

Here, the Mandate violates this principle by artificially splitting the Catholic Church in two and preventing the Church from exercising supervisory authority over its constituent institutions in a way that ensures compliance with Church teachings. In particular, the "religious employer" definition treats the Catholic Church as having two wings—a religious one and a (not-so-religious) charitable/educational one—and treats only the former as a "religious employer." In fact, however, the Church's religious and charitable/educational arms are one and the same: by refusing to recognize the Church's charitable/educational functions as part of a single, integrated whole, the Mandate directly interferes with the unified structure of the Catholic Church. (Griffin Aff. ¶¶ 21-22 (JA387-88)).

The Mandate, moreover, compounds this error by interfering with the Church hierarchy's ability to ensure that subordinate institutions adhere to Church teaching through participation in a single health plan. For example, the Archdiocese makes its self-insured health plan available to the employees of its religious affiliates, including CCA, Archbishop Carroll, Don Bosco, Mary of

Nazareth, Victory Housing, CIC, and Catholic Charities.    In this way, the Archdiocese can directly ensure that these organizations offer health plans consistent with Catholic beliefs.   The Mandate disrupts this internal arrangement by forcing the Archdiocese to either sponsor a plan that will provide the employees of these organizations with access to the mandated coverage, or expel its affiliates from the Archdiocese's plan, thereby subjecting these organizations to massive fines unless they enter into a different contract for the objectionable coverage. Either way, the Mandate directly undermines the Archdiocese's ability to ensure its religious affiliates remain faithful to Church teaching.   (Belford Aff. ¶¶ 14-19 (JA274-76)).

The district court's only response to Plaintiffs' claim was to reiterate the arguments it set forth to conclude that church-plan Plaintiffs lack standing, claiming that the Archdiocese's TPA cannot be compelled to provide the mandated coverage.   (*RCAW* Ct. at 87-88 (JA535-36)).   But as explained above, that position misunderstands Plaintiffs' objection to the Mandate.   *Supra* Part I.B.1.   Regardless of whether the TPA decides to comply with its legal obligations, Plaintiffs cannot, consistent with their religious beliefs, authorize their TPA to provide the mandated coverage.

## VII.  THE GOVERNMENT HAS ERRONEOUSLY INTERPRETED THE SCOPE OF THE "RELIGIOUS EMPLOYER" EXEMPTION[17]

The Government has announced that it will enforce the Mandate in a way that contradicts the text of the regulations and improperly constricts the scope of the "religious employer" exemption.  As codified, the text of the Mandate provides that "*group health plan*[*s*] established or maintained by . . . religious employer[s]" shall be exempt from "any requirement to cover contraceptive services."  45 C.F.R. § 147.131(a) (emphasis added).  Thus, under a plain reading of the text, so long as a plan is "established or maintained by a religious employer," it is not bound by "any requirement to cover contraceptive services."  *Id.*  Indeed, the Government's original interpretation of the Mandate made clear that if a nonexempt religious organization "provided health coverage for its employees through" a plan offered by a separate, "affiliated" organization that was "exempt from the requirement to cover contraceptive services, then neither the [affiliated organization] nor the [nonexempt entity would be] required to offer contraceptive coverage to its employees."  77 Fed. Reg. 16,501 16,502 (Mar. 21, 2012).

The Government has now changed course, rejecting the "plan-based approach" set forth in the regulatory text and instead adopting a novel, "employer-by-employer approach," whereby "each employer [must] independently meet the

---

[17] This claim is unique to the *RCAW* Plaintiffs.

definition of religious employer" "in order to avail itself of the exemption." 78 Fed. Reg. at 39,886. This interpretation is flawed, and is entitled to no deference for two separate reasons.

First, "Auer deference is warranted only when the language of the regulation is ambiguous," Christensen v. Harris Cnty., 529 U.S. 576, 588 (2000); it cannot shield an agency's attempt "to overcome the regulation's obvious meaning." Id. As explained above, the text of the regulation unambiguously provides that if a plan is "established or maintained by a religious employer"—as the Archdiocese's plan is—it is not bound by "any requirement to cover contraceptive services."

Second, Auer deference is not warranted when an agency's new interpretation "conflicts with a prior interpretation" adopted by the Government. Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166 (2012); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 (1994). Here, as noted above, the Government's initial interpretation of the Mandate was that plans sponsored by exempt religious employers would not be required to provide contraceptive services, even for employees of non-exempt employers included in the plan. 77 Fed. Reg. at 16,502. The Government's change of course is entitled to no deference from this Court.

Instead of addressing the merits of the issue, the RCAW court held that Plaintiffs lack standing to challenge the scope of the religious-employer exemption

because "[o]nce the church plan plaintiffs certify their opposition to contraceptive coverage to the Archdiocese's [TPA], their plans will be in compliance with the mandate," and while their TPA will be legally obligated to provide contraception to their employees, that obligation will not be enforceable. (*RCAW* Ct. at 92-93 (JA540-41)).

As explained above, however, this conclusion rests on a misunderstanding of Plaintiffs' religious beliefs. *Supra* Part I.B.1. Plaintiffs object to executing the self-certification, and they object to maintaining a relationship with a TPA that is obligated or even authorized to provide contraceptive services to Plaintiffs' employees, regardless of whether that obligation or authorization is ever consummated. Because the narrow scope of the religious-employer exemption undisputedly requires Plaintiffs to take these actions, they plainly have standing to challenge the regulation.

## VIII. THE MANDATE VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT[18]

"The Equal Protection Clause was intended as a restriction on [government] action inconsistent with elemental constitutional premises. Thus [the Court has] treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.'" *Plyler*

---

[18] This claim is unique to the *PFL* Plaintiffs.

*v. Doe*, 457 U.S. 202, 216-17 (1982); *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972); *Carey v. Brown*, 447 U.S. 455, 461-62 (1980). Consequently, laws that discriminate on the basis of religion or that impinge upon the exercise of fundamental rights violate the pledge of the protection of equal laws guaranteed by the Fifth and Fourteenth Amendments.   Here, the Mandate unlawfully discriminates in both respects: it targets for discriminatory treatment and thus "disadvantages" certain religious employers, including Plaintiffs, who are forced to endorse, facilitate, and cooperate in the Government's immoral objective of promoting contraceptive services in violation of their constitutional rights.

The district court rejected this claim, finding that the Mandate did not impinge upon a fundamental right and concluding that it was "rationally related to the legitimate government purposes of promoting public health and gender equality." (*PFL* Ct. at 44-45 (describing the claim as a "fundamental rights-based claim") (JA181-82)).   As demonstrated above, this conclusion is incorrect. Moreover, the district court failed to address Plaintiffs' claim that the Mandate discriminated on the basis of religion, thereby requiring strict scrutiny review.  *See* 77 Fed. Reg. at 8728 (refusing to provide an exemption and thus discriminating against religious organizations such as Priests for Life based on the Government's judgment that such organizations "do not primarily employ employees who share the religious tenets of the organization" and are thus "more likely to employ

individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives"). Thus, according to the Government, Priests for Life is not sufficiently religious as an organization to qualify for an exemption—even though the Anglican Church, for example, which does not oppose contraception, is. (Priests for Life Supp. Decl. ¶ 8 (JA107)). In short, there is no *rational* basis for such discrimination. *E.g.*, *Romer v. Evans*, 517 U.S. 620, 635 (1996); *Lawrence v. Texas*, 539 U.S. 558 (2003).

## CONCLUSION

For the foregoing reasons, the judgments below should be reversed and these cases remanded with instructions to enter judgment in favor of Plaintiffs.

Respectfully submitted, this the 28th day of February, 2014.

*/s/ Robert J. Muise*
ROBERT J. MUISE, ESQ.
AMERICAN FREEDOM LAW CENTER
P.O. Box 131098
Ann Arbor, Michigan 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org

*/s/ David Yerushalmi*
DAVID YERUSHALMI, ESQ.
AMERICAN FREEDOM LAW CENTER
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Attorneys for Plaintiffs in Priests for Life*

*/s/ Noel J. Francisco*
NOEL J. FRANCISCO
ERIC DREIBAND
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

*Attorneys for Plaintiffs in Roman Catholic Archbishop of Washington*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type volume limitations set out for principal briefs in Federal Rule of Appellate Procedure 32(a)(7)(B) as modified by this court's order of January 29, 2014. The brief, including headings, footnotes, and quotations, contains 15, 975 words, as calculated by the Microsoft Word word count function.

*/s/ Robert J. Muise*

ROBERT J. MUISE
AMERICAN FREEDOM LAW CENTER
P.O. Box 131098
Ann Arbor, Michigan 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org

DAVID YERUSHALMI
AMERICAN FREEDOM LAW CENTER
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Attorneys for Plaintiffs in Priests for Life*

*/s/ Noel J. Francisco*

NOEL J. FRANCISCO
ERIC DREIBAND
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

*Attorneys for Plaintiffs in Roman Catholic Archbishop of Washington*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 28, 2014, I electronically filed a true and correct copy of the foregoing using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Robert J. Muise                                 /s/ Noel J. Francisco

ROBERT J. MUISE                                     NOEL J. FRANCISCO
AMERICAN FREEDOM LAW CENTER                         ERIC DREIBAND
P.O. Box 131098                                     JONES DAY
Ann Arbor, Michigan 48113                           51 Louisiana Avenue, N.W.
(734) 635-3756                                      Washington, DC 20001
rmuise@americanfreedomlawcenter.org                 (202) 879-3939
                                                    njfrancisco@jonesday.com
DAVID YERUSHALMI
AMERICAN FREEDOM LAW CENTER                          *Attorneys for Plaintiffs in Roman*
1901 Pennsylvania Avenue NW, Suite 201               *Catholic Archbishop of*
Washington, D.C. 20006                               *Washington*
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Attorneys for Plaintiffs in Priests for Life*